**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

MKB Management Corp., d/b/a )
Red River Women's Clinic; Kathryn )
L. Eggleston, M.D., )
  )
     Plaintiffs, )  **ORDER GRANTING PLAINTIFFS'**
  )  **MOTION FOR PRELIMINARY**
  vs. )  **INJUNCTION**
  )
Birch Burdick, in his official capacity )
as State Attorney for Cass County, et al., )
  )  Case No. 1:13-cv-071
     Defendants. )

_____

   Before the Court is "Plaintiffs' Motion for Preliminary Injunction" filed on June 25, 2013, seeking an order enjoining the enforcement of North Dakota House Bill 1456. See Docket No. 3. The Plaintiffs further request the bond requirement be waived in this matter. See Docket Nos. 3 and 6. Defendant Birch Burdick filed a response on July 19, 2013. See Docket No. 22. The remaining Defendants also filed a response on July 19, 2013. See Docket No. 23. The Court allowed the Plaintiffs until July 24, 2013, to file a reply brief. However, given the very short timeline before the law goes into effect, the Court elects to issue an order before the reply deadline so as not to wait until the eve of enforcement.[1] The parties have agreed there is no need for a hearing on the motion and the matter may be decided on the briefs. The threshold question is whether the United States Constitution permits the North Dakota legislature to prohibit abortion beginning at six weeks gestation and before the fetus is viable. The United States

_____

[1] H.B. 1456 is schedule to take effect on August 1, 2013. The Court previously established an expedited briefing schedule allowing the Defendants until Friday, July 19, 2013, to file a responsive brief and allowing the Plaintiffs until Wednesday, July 24, 2013, to file a reply brief. The Court understands the time constraints and possible repercussions to the Plaintiffs if the law were to take effect. Accordingly, the Court has elected to issue an order on the motions in an expedited fashion.

Supreme Court has clearly spoken and held that it does not.  For the reasons set forth below, the motion for a preliminary injunction is **GRANTED**.

I.      **BACKGROUND**

The Plaintiff, MKB Management Corp, doing business as Red River Women's Clinic ("the Clinic"), is the only clinic providing abortions in North Dakota.  The Plaintiff, Kathryn Eggleston, is a board-certified family medicine physician licensed in North Dakota.   Dr. Eggleston is the Clinic's medical director and has been providing reproductive health care for women, including abortions, colposcopy services, and family planning services, for over a decade.  The Defendants include various North Dakota officials, including:  Birch Burdick, the State's Attorney for Cass County; Wayne Stenehjem, the Attorney General for the State of North Dakota; and the thirteen members of the North Dakota Board of Medical Examiners.   All Defendants are sued in their official capacity.

The Plaintiffs challenge the constitutionality of House Bill 1456 ("H.B. 1456"), to be codified at North Dakota Century Code Chapter 14-02.1, which provides as follows:

> **Determination of detectable heartbeat in unborn child before abortion-Exception.**
> Except when a medical emergency exists that prevents compliance with this subsection, an individual may not perform an abortion on a pregnant woman before determining, in accordance with standard medical practice, if the unborn child the pregnant woman is carrying has a detectable heartbeat.  Any individual who performs an abortion on a pregnant woman based on the exception in this subsection shall note in the pregnant woman's medical records that a medical emergency necessitating the abortion existed.
>
> * * *
>
> **Abortion after detectable heartbeat in unborn child prohibited–Exception–Penalty.**
> Notwithstanding any other provision of law, an individual may not knowingly perform an abortion on a pregnant woman with the specific intent of causing or abetting the termination of the life of the unborn child the pregnant woman is

2

> carrying and whose heartbeat has been detected according to the requirements of
> [the above section] of this Act.

H.B. 1456, 63d Leg. Assemb., Reg. Sess. (N.D. 2013).  H.B. 1456, passed during the 2013 legislative session, makes it a criminal offense to perform an abortion if a "heartbeat" has been detected, thereby banning abortions beginning at approximately six weeks of pregnancy, with limited exceptions. The amendments contained in H.B. 1456 are scheduled to take effect on August 1, 2013.

Currently, North Dakota law prohibits abortions "[a]fter the point in pregnancy when the unborn child may reasonably be expected to have reached viability," unless "in the medical judgment of the physician the abortion is necessary to preserve the life of the woman or if in the physician's medical judgment the continuation of her pregnancy will impose on her a substantial risk of grave impairment of her physical or mental health."  N.D.C.C. § 14-02.1-04(3).  Viability is defined as "the ability of an unborn child to live outside the mother's womb, albeit with artificial aid."  N.D.C.C. § 14-02.1-02(14) (to be recodified by H.B. 1305 as N.D.C.C. § 14-02.1-02(16)).  However, H.B. 1456 would disrupt the current North Dakota abortion laws and prohibit abortions after a heartbeat is detected, which can occur as early as six weeks after a women's last menstrual period.

The Plaintiffs seek preliminary injunctive relief to restrain the Defendants from enforcing North Dakota H.B. 1456, which would essentially ban abortions in the State of North Dakota. The Plaintiffs contend the North Dakota statute is an unconstitutional abridgment of the right to abortion protected under the Fourteenth Amendment of the United States Constitution.  H.B. 1456 also puts restraints on physicians in performing abortions by providing criminal punishment.  A physician who knowingly violates the ban by performing an abortion when a

heartbeat has been detected may face Class C felony charges, punishable by up to five years in prison.  H.B. 1456 § 2(4) (referencing N.D.C.C. § 12.1-32-01(4)).  Failure to determine whether a heartbeat is detectible is punishable through a disciplinary action against a physician by the North Dakota Board of Medical Examiners, which can include suspension or revocation of the physician's license.  H.B. 1456 §§ 1(2), 3 (creating a new subsection to N.D.C.C. § 43-17-31); N.D.C.C. § 43-17-31 (referencing N.D.C.C. § 43-17-30.1).[2]

## II.   LEGAL DISCUSSION

In determining whether a preliminary injunction should be granted, Rule 65(b) of the Federal Rules of Civil Procedure directs the court to assess whether immediate and irreparable injury, loss, or damage will result to the applicant.  The court is required to consider the factors set forth in Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981). Whether a preliminary injunction or temporary restraining order should be granted involves consideration of "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."  Id.

It is well-established that the burden of establishing the necessity of a temporary restraining order or a preliminary injunction is on the movant.  Baker Elec. Coop., Inc. v. Chaske, 28 F.3d 1466, 1472 (8th Cir. 1994); Modern Computer Sys., Inc. v. Modern Banking Sys., Inc., 871 F.2d 734, 737 (8th Cir. 1989).  "'No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards

---

[2] Based on the record before it, the Court is firmly convinced the Plaintiffs have standing to sue.  See Singleton v. Wulff, 428 U.S. 106, 112-16 (1976); Stenberg v. Carhart, 530 U.S. 914 (2000); Diamond v. Charles, 476 U.S. 54, 65 (1986) ("A physician has standing to challenge an abortion law that poses for him [or her] a threat of criminal prosecution.")

granting the injunction.'" <u>Baker Elec. Coop., Inc.</u>, 28 F.3d at 1472 (quoting <u>Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.</u>, 815 F.2d 500, 503 (8th Cir. 1987)).


### A.      PROBABILITY OF SUCCESS ON THE MERITS

Normally, a party seeking a preliminary injunction need only show a "fair chance," meaning less than fifty percent, of succeeding on the merits.  <u>See</u> <u>Planned Parenthood Minn., N.D., S.D. v. Rounds</u>, 530 F.3d 724, 730 (8th Cir. 2008).  The Eighth Circuit Court of Appeals recently revised the probability of success on the merits factor of the *Dataphase* analysis when applied to challenges of duly enacted statutes.  <u>Id.</u>  The Eighth Circuit concluded that the "fair chance" standard should not be applied to motions to preliminarily enjoin the enforcement of a state statute.  <u>Id.</u>  Instead, "where a preliminary injunction of a duly enacted state statute is sought, . . . a more rigorous threshold showing that the movant is *likely* to prevail on the merits" is required.  <u>Id.</u>  (emphasis added).

The Plaintiffs contend H.B. 1456 is unconstitutional on its face because it bans abortions prior to viability.  Given the controlling United States Supreme Court precedent, the Plaintiffs argue there is an exceedingly high likelihood of success on the merits of their claim that H.B. 1456 violates the substantive due process rights of their patients.  If H.B. 1456 is allowed to take effect, nearly 90% of the abortions currently performed at the Red River Women's Clinic, the sole clinic providing abortions in North Dakota, will be prohibited.  Further, the Clinic would likely have to close its doors if the bill takes effect.  <u>See</u> Docket No. 3-5.  Like many other healthcare facilities, the Clinic depends on patient revenues to function, and the bill would cause the Clinic to lose significant patient revenue.  The Plaintiffs further argue that women will lose a

critical component of their constitutional right to determine the number, timing, and spacing of their children, at great harm to themselves and their families.

The Defendants argue H.B. 1456 does not ban all abortions prior to viability because abortions can be performed up until the point at which a fetal heartbeat is detected and, therefore, is constitutional.   Consistent with Gonzales v. Carhart, 550 U.S. 124 (2007), the Defendants point the Court to states nationwide which have enacted laws limiting and regulating whether, when, and under what circumstances a woman may obtain an abortion.  See Docket No. 23, p. 13.  The Defendants opine H.B. 1456 limits pre-viability abortions after detection of the fetal heartbeat pursuant to the State's interest "in protecting the life of the fetus that may become a child . . . ." Gonzales, 550 U.S. at 158.

The Defendants also argue a woman's right to abortion before viability is not absolute and must be weighed against the state's interest in protecting the fetus and the mother. According to the Defendants', the fact that H.B. 1456 serves a valid purpose -- to further the state's interest in protecting the life of the unborn, protecting the physical and mental health of women who may seek to procure an abortion, preserving the integrity of the medical profession, preventing the coarsening of society's moral sense and promoting respect for human life -- "not designed to strike at the right itself, [but which] has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." Id. at 157-58 (quoting Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 874 (1992)).   While the Defendants are correct that a state's interests must also be examined in the abortion debate, the state's interest cannot unduly burden a woman's right to choose.  Further, the Defendants argue the limits put in place by H.B. 1456 are merely regulations to abortions, with exceptions for later abortions carved into the law.

The Plaintiffs' challenge to the abortion statute in question focuses on the purported infringement on the constitutional right to choose an abortion, first enunciated in Roe v. Wade, 410 U.S. 113 (1973), and refined in Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833 (1992).  In *Roe,* the United States Supreme Court held a pregnant woman has a constitutional right, under the Due Process Clause of the Fourteenth Amendment, to choose to terminate her pregnancy before viability. 410 U.S. at 152–66.  "[T]he concept of viability . . . is the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb, so that the independent existence of the second life can in reason and all fairness be the object of state protection that now overrides the rights of the woman."  Casey, 505 U.S. at 870 (citing Roe v. Wade, 410 U.S. at 163).

In *Casey,* the Supreme Court upheld *Roe's* essential holding by reaffirming "the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State."  505 U.S. at 846.  In other words, a woman has a constitutional right to choose to terminate her pregnancy before the fetus is viable without undue interference by the state.  Id.  This right is encompassed within a woman's right to personal privacy.  The constitutional right to choose recognized in *Roe* and reaffirmed in *Casey* is "the woman's right to make the ultimate decision."  Id. at 877.

The Supreme Court in *Casey* also clarified that the right to obtain an abortion is not absolute and that state interests in maternal health and protecting fetal life can, in some circumstances, justify regulations of abortion. Id. at 846. The Supreme Court in *Casey* abandoned *Roe's* trimester framework of analysis for determining the validity of an abortion regulation, and replaced it with an undue burden standard.  Under the undue burden standard, an abortion law is unconstitutional on its face if "in a large fraction of the cases in which [the law]

7

is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion."

Id. at 845-46; see also Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452, 1456-58

(8th Cir. 1995).

The United States Supreme Court in *Casey* then asked whether a law designed to further

the State's interest in fetal life, but which imposed an undue burden on a woman's decision

before fetal viability, could be constitutional.  Id. at 877.  The Supreme Court clearly answered

this question "no."  Id.  The plurality opinion in *Casey* contained a summary of the salient points

which are useful for the issues presented by the constitutionality of H.B. 1456.

> • An undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus obtains viability.
>
> • To promote the state's profound interest in potential life, throughout pregnancy the state may take measures to ensure that the woman's choice is informed, and measures designed to advance this interest will not be invalidated as long as their purpose is to persuade the woman to choose childbirth over abortion. However, these measures must not be an undue burden on the right to have an abortion.
>
> • As with any medical procedure, the state may enact regulations to further the health or safety of a woman seeking an abortion. Unnecessary health regulations that have the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion impose an undue burden on the constitutionally protected right to choose.
>
> • Regardless of whether exceptions are made for particular circumstances, a state may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability.
>
> • Subsequent to viability, and in promoting its interest in the potentiality of human life, the state may regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.

McCormack v. Hiedman, 900 F. Supp. 2d 1128, 1143-44 (D. Idaho 2013) (citing Casey, 505

U.S. at 878–79). The plurality in *Casey* explained "[a] finding of an undue burden is a shorthand

for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." Casey, 505 U.S. at 877. This Court is guided by and obligated to follow the United States Supreme Court's decision in *Roe* and *Casey*. Against this background, the Court will consider the constitutionality of H.B. 1456 and the Plaintiffs likelihood of success on the merits.

For many women, the decision whether to have an abortion is a difficult one involving the consideration of many factors which include, but are not limited to, finances, education, current family size, health, and pregnancy due to domestic violence or rape. See Docket No. 3-5, p. 3.[3] Women contemplating an abortion also have to grapple with the cost of the abortion itself versus the long-term financial implications of not having one. McCormack v. Heidman, 694 F.3d 1004, 1017 (9th Cir. 2012). Because some women with lower incomes may not have the financial resources to confirm suspected pregnancies, these women are often forced to wait until later in their pregnancies to obtain an abortion. Id. Delayed confirmation compounds the financial difficulties, as the cost of abortion services increases throughout the pregnancy period.

In support of the motion for a preliminary injunction, the Plaintiffs submitted declarations of two physicians practicing medicine in North Dakota in the fields of obstetrics and gynecology. Kathryn Eggleston, M.D. has been the medical director of the Red River Women's Clinic since 2008. Dr. Eggleston provides abortions at the Clinic one day a week, about forty-five to fifty weeks each year. In her declaration, Dr. Eggleston described her professional background, including board certification in family medicine and over a decade of experience providing reproductive health care to women.

---

[3] The Plaintiffs submitted a declaration of Tammi Kromenaker in support of the motion for preliminary injunction. Kromenaker is the Director of the Clinic, and as such, is familiar with the practices and procedures of the Clinic.

Dr. Eggleston explained the practices of the Clinic and the practice of determining whether a woman has the option of abortion.  Pregnancy is commonly measured by the number of days that have passed since the first day of a woman's last menstrual period ("LMP").  The Clinic provides abortions to women from about five weeks LMP through about sixteen weeks LMP.  The Clinic's protocols include an ultrasound for all potential abortion patients.  The ultrasound is important in dating the pregnancy, determining whether the pregnancy is located inside the uterus, and detecting cardiac activity.  The presence of cardiac activity is an important indicator that a pregnancy retains the potential for viability.  Cardiac activity can be detected as early at six weeks LMP on average, and sometimes a few days earlier.

The Clinic does not typically perform abortions before five weeks LMP because, due to the pregnancy's extremely small size, it may not be possible to confirm the exact location of the pregnancy in the uterus.  If the location of the pregnancy is not confirmed, it can be dangerous to perform an abortion.  As previously noted, North Dakota law defines viability as "the ability . . . to live outside the mother's womb, albeit with artificial aid."  N.D.C.C. § 14-02.1-02(14).  Dr. Eggleston opines a fetus does not become viable until approximately twenty-four weeks LMP which appears to be largely undisputed in the medical literature.  While the point of viability differs with each pregnancy, the twenty-four week viability mark is eighteen weeks after the point at which the State of North Dakota seeks to ban abortions.

Christie Iverson, M.D. also submitted an affidavit in support of the motion.  See Docket No. 3-3.  Dr. Iverson is a board-certified obstetrician and gynecologist licensed to practice in North Dakota.  Dr. Iverson also opines that viability, or the time when a fetus has a reasonable chance for sustained life outside the womb, albeit with lifesaving medical intervention, does not occur until approximately twenty-four weeks LMP.  She further states "no pregnancy is viable at

6 weeks LMP, nor for several months thereafter." See Docket No. 3-3, p. 4. Both Dr. Eggleston and Dr. Iverson state that they believe H.B. 1456 will harm the women of North Dakota by virtually banning the practice of abortion in the state. The State did not submit any affidavits to refute the testimony of Drs. Eggleston and Iverson.

The record reveals that many women must travel long distances to the closest abortion provider, especially in North Dakota, where only one clinic provides these services. Kromenaker indicates in her declaration that the Clinic's patients travel from throughout the state, and from neighboring states, resulting in hundreds of miles of travel for this care. See Docket No. 3-5, p. 3. Due to the small population of North Dakota and surrounding areas, the Clinic typically performs abortions only one day per week. Id. North Dakota law also requires a delay of at least twenty-four hours between the time a patient receives mandated information and when the abortion is performed. Id. If a patient is a minor, parental consent or judicial authorization is required, sometimes extending the twenty-four hour waiting period. Id.

Dr. Eggleston states many women do not know they are pregnant until after six weeks LMP, or after a heartbeat is detected. See Docket No. 3-1, p. 5. Typically only women who have regular menstrual periods, keep close track of them, and take a pregnancy test promptly after a missed period at four weeks LMP, will know they are pregnant by six weeks. Id. Because the Clinic only performs abortions one day per week, and cannot safely perform abortions before five weeks LMP, H.B. 1456 will effectively limit a woman's ability to obtain an abortion to a single day during the pregnancy's fifth week. Id. According to the three most recent years of Induced Termination of Pregnancy Reports made available by the North Dakota

Department of Health,[4] 89% of abortions performed at the Clinic occur at and after six weeks LMP.  See Docket No 3-5.

A woman's constitutional right to terminate a pregnancy before viability has consistently been upheld by the United States Supreme Court in the forty years since *Roe v. Wade*.  See e.g., City of Akron v. Akron Ctr. for Reprod. Health, Inc., 462 U.S. 416, 420 (1983) (a woman has a constitutional right to terminate her pregnancy) (overruled on other grounds); Casey, 505 U.S. at 846 (a woman has a right to an abortion before viability without undue interference from the state); Stenberg, 530 U.S. at 921 (a woman has the right to choose an abortion before viability); Gonzales, 550 U.S. 124 (the state may not prevent "any woman from making the ultimate decision to terminate her pregnancy").

The right to terminate a pregnancy is not absolute, and must be balanced with the state's interest in protecting the woman's health and the potential life of the fetus.  Roe, 410 U.S. at 162. After the fetus becomes viable, a state's interest in protecting its potential life becomes compelling enough in certain circumstances to outweigh the woman's right to seek an abortion. See Casey, 505 U.S. at 845-46.  However, it is clear that before viability, "the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure."  Id.  The state can impose *regulations* aimed at ensuring a thoughtful and informed choice, but only if such regulations do not unduly burden the right to choose.  Id. at 872.  The Supreme Court's central holding in *Roe* and *Casey* is that *viability* marks the earliest point at which a state's interest in fetal life may be adequate to justify a ban on non-therapeutic abortions.  Thus, it is well-established in United

---

[4] N.D. DEP'T OF HEALTH, VITAL RECORDS, *available at* http://ndhealth.gov/vital/pubs.htm (follow Induced Termination of Pregnancy Report; then follow 2009 Report (pdf), 2010 Report (pdf), and 2011 Report (pdf)).

States Supreme Court precedent that before viability a woman has a right to choose to terminate her pregnancy.

Recently, other courts – including other federal district courts – have been faced with similar state statutes that would effectively eliminate a substantial portion of abortion providers in various states.  These courts have found such elimination of abortion providers to constitute a substantial obstacle to a woman's right to seek an abortion.  See, e.g., Okpalobi v. Foster, 190 F.3d 337, 357 (5th Cir. 1999) (affirming a district court's finding that the regulation's effect of closing clinics which provided approximately 80% of all abortions in the state constituted an undue burden); Planned Parenthood Se., Inc. v. Bentley, No. 2:13cv406-MHT, 2013 WL 3287109, at *7 (M.D. Ala. June 28, 2013) (granting temporary restraining order where admitting privileges requirement would close three of five clinics in the State of Alabama); Jackson Womens' Health Org. v. Currier, No. 3:12cv436-DPJ-FKB, 2013 WL 1624365, at *5 (S.D. Miss. Apr. 15, 2013) (granting preliminary injunction after finding an undue burden where state admitting privileges requirement would close the only known abortion provider in Mississippi).

One federal court in Arkansas has recently addressed a very similar constitutional challenge to a state statute seeking to ban abortions where a fetal heartbeat is detected and the fetus has reached twelve weeks gestational age.  See Edwards v. Beck, No. 4:13CV00224SWW, 2013 WL 2302323 (E.D. Ark. May 23, 2013).  The United States District Court for the Eastern District of Arkansas found the Plaintiffs met the burden of showing sufficient evidence of each Dataphase factor, warranting a preliminary injunction enjoining the act passed by the Arkansas Legislature seeking to prohibit abortions where a fetal heartbeat is detected after twelve weeks LMP.  Id. at *5-6.  More important, the federal district court in Arkansas found that an abortion law is unconstitutional on its face if, in a large fraction of the cases in which the law is relevant,

13

the law will operate as a substantial obstacle to a woman's choice to undergo an abortion.  Id. at

*4.  The federal case in Arkansas involved an unconstitutional law prohibiting abortions after

twelve weeks LMP, which is six weeks later than the North Dakota law (H.B. 1456) which is to

take effect on August 1, 2013.

Finally, on May 21, 2013, the Ninth Circuit Court of Appeals held that an Arizona law,

passed in 2012, that prohibits abortions beginning at 20-weeks gestation, was unconstitutional.

See Isaacson v. Horne, 716 F.3d 1213 (9th Cir. 2013).  In the court's words,

> [u]nder controlling Supreme Court precedent, Arizona may not deprive a woman
> of the choice to terminate her pregnancy at any point prior to viability.  Section 7
> effects such a deprivation, by prohibiting abortion from twenty weeks gestational
> age through fetal viability.  The twenty-week law is therefore unconstitutional
> under an unbroken stream of Supreme Court authority, beginning with *Roe* and
> ending with *Gonzales.*  Arizona simply cannot proscribe a woman from choosing
> to obtain an abortion before the fetus is viable.

Id. at 1231.

It is crystal clear from United States Supreme Court precedent that *viability*, although not

a fixed point, is the critical point.  The Supreme Court in *Casey* noted that although the line of

viability may come earlier with advances in neonatal care, the attainment of viability continues

to serve as the critical factor.  505 U.S. at 860.  The Supreme Court in *Casey* could not have been

more clear in stating:

> The soundness or unsoundness of that constitutional judgment in no sense turns
> on whether viability occurs at approximately 28 weeks, as was usual at the time of
> *Roe*, at 23 to 24 weeks, as it sometimes does today, or at some moment even
> slightly earlier in pregnancy, as it may if fetal respiratory capacity can somehow
> be enhanced in the future. Whenever it may occur, the attainment of viability may
> continue to serve as the critical fact, just as it has done since *Roe* was decided;
> which is to say that no change in *Roe*'s factual underpinning has left its central
> holding obsolete, and none supports an argument for overruling it.

Id.

14

More important, although viability may be a flexible point, it is clearly one that is medically determinable.  The United States Supreme Court has repeatedly held that "'the determination of whether a particular fetus is viable is, and must be, a matter for the judgment of the responsible attending physician.'"  Colautti v. Franklin, 439 U.S. 379, 396 (1979) (citing Planned Parenthood of Cent. Mo. v. Danforth, 428 U.S. 52, 64-65 (1976)).  The Supreme Court further said that is why a state may not fix viability at a specific point in the pregnancy.  Id. at 388-89.

This Court recognizes the attainment of viability may continue to come earlier in a pregnancy with significant advances in medicine.  The practical effect of H.B. 1456 is to prohibit any abortion after a heartbeat is detected, which can occur as early as six weeks LMP.  Coupled with the standard set forth in current North Dakota law that an abortion is allowed until viability, the new law seems to suggest that a fetus is viable at the point a heartbeat is detected.  To suggest a fetus can live outside the mother's womb at six weeks, even with the help of innovative neonatal advancements, is simply unproven.  There is no evidence in the record before the Court to support such a position.  The Plaintiffs submitted affidavits of two experienced physicians whom have opined that viability does not occur until twenty-four weeks LMP.  That time frame appears to be consistent with modern day medicine.  The State did not submit any evidence to refute the point of viability which is the critical point in the analysis.  There can be no doubt that requiring women to explore the intricacies of state abortion laws to ensure that they and their provider act within the North Dakota abortion statutes framework, results in an "undue burden" on a woman seeking an abortion of a non-viable fetus.

The Defendants have wholly failed to provide any conclusive evidence that a fetus, at the time a heartbeat is detected around six weeks, could live outside of the mother's womb and thus

be "viable."   The Defendants argument that H.B. 1456 is not a complete ban on abortions because the abortions can still be performed prior to six weeks is unpersuasive.  The Defendants have offered no competing evidence challenging Dr. Eggleston and Dr. Iverson's affidavits or the statistical data referenced by Kromenaker in determining what percentage of abortions will be banned in North Dakota by the enactment of the new law.   These affidavits explain the procedures of the Clinic and the justification for not performing abortions prior to five weeks based on the potential harm to the mother.

Moreover, the Defendants' arguments necessarily rest on the premise that every Court of Appeals to strike a ban on pre-viability abortion care has misread United States Supreme Court precedent.  If the Defendants were indeed correct, then the Texas abortion ban at issue in *Roe v. Wade* would itself have been merely a regulation, as it had exceptions, such as to "sav[e] the life of the mother."  <u>Roe</u>, 410 U.S. at 164.  As the Supreme Court has stated unequivocally, the proclamation made in *Casey* holds "[r]egardless of whether exceptions are made for particular circumstances."  <u>Casey</u>, 505 U.S. at 879.  Under the bright-line viability rule the United States Supreme Court established in *Roe* and affirmed in *Casey*, a state may not ban abortions at any point prior to viability, and a statute's exceptions cannot save it.

The Plaintiffs have clearly shown that H.B. 1456 more than likely prohibits pre-viability abortions in a large percentage of cases in North Dakota, thereby imposing an undue burden on women seeking to obtain an abortion.   H.B. 1456 equates fetal viability with a 6-week gestational age and a fetal heartbeat, and it bans abortions according to that definition.  It is well-established that controlling United States Supreme Court precedent provides that viability is "the time at which there is a realistic possibility of maintaining and nourishing a life outside the

womb, so that the independent existence of the second life can in reason and all fairness be the object of state protection . . . ."  Casey, 505 U.S. at 870 (citing Roe, 410 U.S. at 163).

It is clear and undisputed that until *Roe v. Wade* and *Planned Parenthood of Southeastern Pennsylvania v. Casey* are overturned by the United States Supreme Court, this Court is bound to follow that precedent under the rule of *stare decisis*.  See Casey, 505 U.S. at 870 (stating that the doctrine of *stare decisis* requires reaffirmance of *Roe v. Wade*'s essential holding recognizing a woman's right to choose an abortion before fetal viability).   In considering the fundamental constitutional question resolved by *Roe v. Wade* and *Casey*, principles of institutional integrity, and the rule of *stare decisis*, this Court is led to conclude the Plaintiffs have demonstrated a strong likelihood of success on the merits that H.B. 1456 is unconstitutional.   Thus, the Court finds this *Dataphase* factor weighs strongly in favor of the issuance of a preliminary injunction.

## B.    IRREPARABLE HARM

The plaintiff must show there is a threat of irreparable harm if injunctive relief is not granted, and that such harm is not compensable by money damages.  Doe v. LaDue, 514 F. Supp. 2d 1131, 1135 (D. Minn. 2007) (citing Northland Ins. Cos. v. Blaylock, 115 F. Supp. 2d 1108, 1116 (D. Minn. 2000)).   "The 'mere possibility' that harm may occur before a trial on the merits is not enough."  Johnson v. Bd. of Police Comm'rs, 351 F. Supp. 2d 929, 945 (E. D. Mo. 2004).  The party that seeks injunctive relief must show that a significant risk of harm exists.  Doe, 514 F. Supp. 2d at 1135 (citing Johnson, 351 F. Supp. 2d at 945).  The absence of such a showing is sufficient grounds to deny injunctive relief.  Id. (citing Gelco Corp. v. Coniston Partners, 811 F.2d 414, 420 (8th Cir. 1987)).

It is well-established that the inability to exercise a constitutional right constitutes irreparable harm.  See Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action, 558 F.2d 861, 867 (8th Cir. 1977).  The Plaintiffs argue enforcement of H.B. 1456 would essentially deny abortions to nearly 90% of women in North Dakota seeking an abortion, and with a lack of revenue, would force the closure of the Clinic, resulting in a total ban on abortions in North Dakota.  The Defendants argue that if such a large number of abortions are restricted, it will be as a result of the Plaintiffs refusal to change the practices of the Clinic to comply with H.B. 1456.  The Defendants further argue the Plaintiffs have merely presented speculation and hypotheticals, and failed to establish any definite, irreparable injury.

In this case, North Dakota's enforcement of H.B. 1456 will prevent women from obtaining abortions after six weeks that otherwise are allowed under current North Dakota law, and which abortions are permitted in accordance with United States Supreme Court precedent established forty years ago.  The Court finds the Plaintiffs have established that they and their patients will be subjected to the threat of irreparable injury in the absence of a preliminary injunction.  Without an injunction enjoining the enforcement of H.B. 1456, the Plaintiffs will face criminal charges if they continue to run the Clinic and provide abortions to patients.  If the Plaintiffs choose to comply with H.B. 1456, they will undoubtedly have to close the doors of the Clinic due to lack of patient revenue.  Further, because H.B. 1456 would prohibit abortions that come within the pre-viability time frame, the Plaintiffs' patients face an imminent threat to their ability to exercise the constitutional right to choose to terminate a pregnancy.  The threat of criminal prosecution, the potential for the closing of the clinic, and the violation of patient rights is more than sufficient to show a threat of irreparable harm not compensable by money damages.  See Planned Parenthood of Minn., 558 F.2d at 867 (finding that "Planned Parenthood's showing

18

that the ordinance interfered with the exercise of its constitutional rights and the rights of its patients supports a finding of irreparable injury."). The Court finds this *Dataphase* factor weighs strongly in favor of granting a preliminary injunction.

### C.    BALANCE OF HARM

The Plaintiffs argue the balance of equities tips in favor of the Clinic and its patients. Absent a preliminary injunction, the ban would force the Plaintiffs to cease providing abortion care currently protected by the United States Constitution, and would force the patients to continue unwanted pregnancies. However, if a preliminary injunction is not granted, the Defendants would suffer no harm by the current status quo being preserved as established in *Roe v. Wade*.

The Defendants argue that if a preliminary injunction is granted, the State will be deprived of its ability to enforce a duly enacted law aimed at protecting the potential life of an unborn child and a woman's health. However, the Defendant Birch Burdick, in his official capacity as State's Attorney for Cass County, concedes that if the Court were to grant the Plaintiffs' motion until the underlying claims are otherwise heard on the merits, no harm would be done to the Cass County State's Attorney's office. See Docket No. 22, p. 3.

In considering the substantial impact that H.B. 1456 would have on a woman's right to choose, the balance of hardships tips in the Plaintiffs' favor. The Defendants have failed to demonstrate any benefit to maternal health by banning abortions beginning at approximately six weeks of pregnancy, and there is no meaningful counterweight recognized by the United States Supreme Court to justify the enforcement of H.B. 1456 on August 1, 2013. Maintaining the status quo pending litigation will not deprive the Defendants of the ability to enforce current

state laws aimed at protecting a woman's health and the potential life of the fetus as established under Supreme Court precedent and current North Dakota law.  The Court finds this *Dataphase* factor weighs strongly in favor of the issuance of a preliminary injunction.


### D.    PUBLIC INTEREST

Whether the grant of a preliminary injunction furthers the public interest is largely dependent on the likelihood of success on the merits because the protection of constitutional rights is always in the public interest.  See Phelps-Roper v. Nixon, 545 F.3d 685, 690 (8th Cir. 2008).  Given the substantial likelihood of success on the merits and of irreparable harm established by the Plaintiffs, the public's interest is best served by imposing a preliminary injunction.  Thus, the Court finds this *Dataphase* factor also weighs in favor of the issuance of a preliminary injunction.


## III.   CONCLUSION

After a careful review of the entire record, and a thorough analysis of the *Dataphase* factors, the Court finds the Plaintiffs have met the burden under Rule 65 for the issuance of a preliminary injunction.  There is no question that North Dakota H.B. 1456 is in direct contradiction to a litany of United States Supreme Court cases addressing restraints on abortion. H.B. 1456 is clearly an invalid and unconstitutional law based on the United States Supreme Court precedent in *Roe v. Wade* from 1973, *Planned Parenthood of Southeastern Pennsylvania v. Casey* from 1992, and the progeny of cases that have followed.  As a practical matter, H.B. 1456 would ban nearly 90% of all abortions performed at the only clinic in North Dakota which provides such services, in direct contradiction to United States Supreme Court precedent.  The

North Dakota strict ban on abortions at the time when a "heartbeat" has been detected – essentially banning all abortions as early as six weeks of pregnancy – cannot withstand a constitutional challenge in any court of law.

A woman's constitutional right to terminate a pregnancy before viability has been recognized by the United States Supreme Court for forty years.  The undersigned is bound to follow that precedent and uphold the law.  Because the United States Supreme Court has clearly determined the dispositive issue presented in this dispute, this Court is not free to impose its own view of the law.  The State of North Dakota has presented no evidence to justify the passage of this troubling law.  The State has extended an invitation to an expensive court battle over a law restricting abortions that is a blatant violation of the constitutional guarantees afforded to all women.  The United States Supreme Court has unequivocally said that no state may deprive a woman of the choice to terminate her pregnancy at a point prior to viability.   North Dakota House Bill 1456 is clearly unconstitutional under an unbroken stream of United States Supreme Court authority.

The Court **GRANTS** the Plaintiffs' motion for a preliminary injunction (Docket No. 3) and **ORDERS**:

(1)     That the Defendants or anyone acting on their behalf, shall be restrained and enjoined during the pendency of this action from enforcing or otherwise implementing House Bill 1456 of the 2013 Regular Session of the 63rd Legislative Assembly of North Dakota.

(2)     No bond shall be required to be posted by the Plaintiffs before the preliminary injunction is effective.  See Rule 65(c).  Plaintiffs' motion for bond to be waived (Docket No. 6) is **GRANTED**.

(3)      The Plaintiffs shall arrange for the immediate service of this order on the

Defendants.

(4)      The parties shall inform the Court within the next thirty (30) days whether

there is a need to schedule a trial on the merits.

**IT IS SO ORDERED.**

Dated this 22nd day of July, 2013.

*/s/  Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court