**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NORTH DAKOTA**

**SOUTHWESTERN DIVISION**

MKB MANAGEMENT CORP., et al.,

                     Plaintiffs,

vs.

BIRCH BURDICK, et al.,

                     Defendants.

Case No. 1:13-cv-071

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION**

**FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS…..……………………………………………..………….....   i

TABLE OF AUTHORITIES……..…………………………………………..…………   i

      Introduction…………………………………………………………………   1

I.    Statutory Framework and Undisputed Facts…………………………………...   1

II.   Argument …………………………………………………………............   4

      A.    House Bill 1456 Violates the Substantive Due Process Rights of Women   5
           Seeking Abortions…..…………………………………………………

           1.   HB 1456 bans abortion prior to viability and is therefore *per se*   6
                unconstitutional………………………………………………......

           2.   HB 1456 imposes an undue burden on women seeking pre-viability   8
                abortions………………………………………………………………

      B.    House Bill 1456 Violates the Equal Protection Rights of Women Seeking   10
           Abortion By Discriminating Against Them on the Basis of Sex……………...

           1.   HB 1456 violates equal protection by limiting women's, but not   14
                men's, ability to make medical decisions……………………………...

           2.   HB 1456 violates equal protection by denying women the ability to   18
                participate equally in society………………………………………...

      Conclusion………………………………………………………………………..   22

**TABLE OF AUTHORITIES**

**CASES**                                                                                                    **Page**

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986)……………………………………………4

*Califano v. Westcott,* 443 U.S. 76 (1979)……………………………………………………..13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)……………………………………………5

*Colautti v. Franklin*, 439 U.S. 379 (1979) (8th Cir. 2008)…………………………………..2, 7

*Edwards v. Beck*, ___ F. Supp. 2d ___, 2013 WL 2302323 *5
    (E.D. Ark., May 23, 2013)………………………………………………………......10

*Frontiero v. Richardson*, 411 U.S. 677 (1973)…………………………….......10, 12, 16

*Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827………………………………………5

*Gonzales v. Carhart*, 550 U.S. 124 (2007)……………………………………………6, 8, 18

*Hayek v. City of St. Paul*, 488 F.3d 1049 (8th Cir. 2007)………………………………………4

*Iowa Right to Life Comm., Inc. v. Tooker*, 717 F.3d 576 (8th Cir. 2013)……………………9

*Isaacson v. Horne*, 716 F.3d 1213, 1228-29 (9th Cir. 2013)…………………………7, 8, 15-16

*Jane L. v. Bangerter*, 102 F.3d 111 (10th Cir. 1996) ………………………………………9-10

*J.E.B. v. Alabama*, 511 U.S. 127 (1994)…………………………………………......11, 13, 18

*Lawrence v. Texas*, 539 U.S. 558 (2003)……………………………………………………5

*McCormack v. Hiedeman*, 900 F. Supp. 2d 1128 (D. Idaho 2013)……………………………10

*Mississippi Univ. for Women v. Hogan*, 458 U.S. 718 (1982)……………………………..11, 12

*Nev. Dept. of Human Resources v. Hibbs,* 538 U.S. 721 (2003)………………………....16-17, 18

*Orr v. Orr,* 440 U.S. 268 (1979)……………………………………………………………13

*Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52 (1976)……………………………7

*Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452 (8th Cir. 1995)………....6, 8, 9

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992)…………………………..*passim*

*Rau v. Roberts*, 640 F.3d 324 (8th Cir. 2011)……………………………………………..4

*Reed v. Reed*, 404 U.S. 71 (1971)………………………………………………………..10

*Roe v. Wade*, 410 U.S. 113 (1973)………………………………………………………..6

*Sojourner T. v. Edwards,* 974 F.2d 27 (5th Cir. 1992) …………………………………10

*Stenberg v. Carhart*, 530 U.S. 914 (2000)………………………………………………..6

*U.S. v. Virginia*, 518 U.S. 515 (1996)……………………………………………*passim*

*Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975)…………………………………11, 12-13

*Wierman v. Casey's Gen. Stores*, 638 F.3d 984 (8th Cir. 2011)………………………….4

*Wingate v. Gage Cnty. Sch. Dist., No. 34*, 528 F.3d 1074 (8th Cir. 2008)……………….4

## CONSTITUTION AND STATUTES

U.S. Const., Amend. XIV……………………………………………………………*passim*

Fed. R. Civ. P. 56………………………………………………………………………4, 5

N.D. Cent. Code § 3-17-30.1.1…………………………………………………………..2

N.D. Cent. Code § 14-02.1-02………………………………………………......2, 4, 15

N.D. Cent Code § 14-02.1-02.1(1)(d)…………………………………………………..14

N.D. Cent. Code § 14-02.1-02.2…………………………………………………………4

N.D. Cent. Code § 14-02.1-03(1)………………………………………………………..4

N.D. Cent. Code § 14-02.1-04(2)………………………………………………………..2

N.D. Cent. Code § 14-02.1-07………………………………………………….......4

HB 1456……………………………………………………………………………*passim*

## INTRODUCTION

Plaintiffs challenge North Dakota House Bill 1456, which prohibits nearly all abortions beginning at approximately six weeks of pregnancy.  Supreme Court decisions over the last forty years make clear, however, that a woman's right to terminate a pregnancy up until the point of viability is protected under the Due Process Clause of the Fourteenth Amendment.  House Bill 1456 cannot stand in the face of this directly controlling precedent.  As this Court noted in granting Plaintiffs' Motion for Preliminary Injunction, the ban is "clearly an invalid and unconstitutional law."  Order Granting Pls.' Mot. for Prelim. Inj. at 20, ECF No. 25.

House Bill 1456 also violates the right of women to be free from sex discrimination, under the Equal Protection Clause, by denying women the right to make medical decisions, when no such restrictions are placed on men, and by denying women the ability to terminate a pregnancy, thereby limiting their ability to participate equally in society.

As there are no genuine issues of material fact in dispute, Plaintiffs are entitled to summary judgment declaring House Bill 1456 unconstitutional.

## I.  STATUTORY FRAMEWORK AND UNDISPUTED FACTS

House Bill 1456 ("HB 1456" or "the Act") was enacted by the North Dakota legislature during its 2013 session and signed into law on March 26, 2013.  It requires that any individual performing an abortion must, prior to the procedure, determine, "in accordance with standard medical practice," whether the embryo or fetus has a detectable heartbeat.  HB 1456 § 1.1.  If a heartbeat is detected, the Act prohibits the performance of an abortion.  HB 1456 § 2.1.  The only exception to the ban is for procedures performed "to prevent the death of a pregnant woman, to prevent a serious risk of the substantial and irreversible impairment of a major bodily function of the pregnant woman, or to save the life of an unborn child."  HB 1456 § 2.2(a).  Performance of an abortion in violation of the ban is a Class C felony.  HB 1456 § 2.4.  Except in medical

emergencies, performance of an abortion without determining whether a fetal heartbeat is detectable is grounds for disciplinary action against the physician by the North Dakota Board of Medical Examiners, HB 1456 § 3, which can include license revocation. N.D. CENT. CODE § 3-17-30.1.1.

Viability is the point in a pregnancy at which "there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support." *Colautti v. Franklin*, 439 U.S. 379, 388 (1979); *see also* N.D. CENT. CODE § 14-02.1-02(19) ("'viable' means the ability of an unborn child to live outside the mother's womb, albeit with artificial aid").[1] Viability typically occurs around twenty-four weeks of pregnancy. *See* Decl. of Kathryn Eggleston, M.D., attached as Exh. 1 to Pls.' Mot. for Summ. J. ("Eggleston Decl.") at ¶ 11; Decl. of Christie Iverson, M.D., attached as Exh. 2 to Pls.' Mot. for Summ. J. ("Iverson Decl.") at ¶ 6. *See also* Information About Pregnancy and Abortion, North Dakota Dept. of Health, http://www.ndhealth.gov/familyhealth/preg_abortion_booklet_final.pdf, at 8 (at 24 weeks lmp, survival rates are "50 to 60 percent with a high risk for permanent disability"; at 22 weeks lmp, "a child could potentially survive outside the womb, but survival rates are very low and the risk for permanent disability is high. Most babies born before this time have little chance of survival.")

A fetal heartbeat is usually detectible through the use of vaginal ultrasound at six weeks of pregnancy, as measured from the first day of the woman's last menstrual period ("lmp"), and in some cases a few days before. Eggleston Decl. at ¶ 9; Iverson Decl. at ¶ 5. Red River Women's Clinic ("the Clinic"), the only abortion clinic in North Dakota, provides abortions from

---

[1] Before HB 1456, North Dakota permitted abortion up to the point at which a fetus "may reasonably be expected to have reached viability," and thereafter, prohibited abortion unless necessary to preserve a pregnant woman's life or health. N.D. CENT. CODE § 14-02.1-04(2).

about five weeks lmp through about sixteen weeks lmp.  Decl. of Tammi Kromenaker, attached as Exh. 3 to Pls.' Mot. for Summ. J. ("Kromenaker Decl.") at ¶ 4; Eggleston Decl. at ¶ 6.  All of the abortions provided at the clinic are therefore well before viability.  Eggleston Decl. at ¶ 11. Iverson Decl. at ¶ 6.

An ultrasound is performed on all patients prior to receiving an abortion at the Clinic. Eggleston Decl. at ¶ 8.  The ultrasound serves several important functions, including:  1) dating the pregnancy; 2) determining where the pregnancy is located in the uterus; and 3) determining if the pregnancy is ongoing, by the observation of fetal cardiac activity.  Eggleston Decl. at ¶ 8-9. The ability to confirm the location of the pregnancy in the uterus using vaginal ultrasound sets the early limit on the Clinic's ability to perform abortions.  If the location of the pregnancy cannot be confirmed it can be dangerous to perform the abortion.  Therefore, the Clinic does not typically perform abortions before five weeks lmp because, due to the pregnancy's extremely small size, it may not be possible to confirm the location of the pregnancy in the uterus. Eggleston Decl. at ¶ 10.

A significant number of women do not yet realize they are pregnant at six weeks lmp because of irregular menses or light bleeding that commonly occurs at the beginning of pregnancy and is mistaken for a period.  Eggleston Decl. at ¶¶ 10, 12; Iverson Decl.  ¶¶ 9-10. Many women, upon learning that they are pregnant, need time to decide whether to continue or terminate the pregnancy.  Eggleston Decl. ¶ 14; Iverson Decl. ¶¶ 12; Kromenaker Decl. ¶ 5.  In making the decision, women consider many factors, including, but by no means limited to, the potential health risks associated with abortion and carrying to term.  Eggleston Decl. at ¶ 15; Kromenaker Decl. at ¶ 5.  All women must observe a twenty-four hour delay between the time

that they receive state-mandated information from the Clinic and the beginning of the procedure. N.D. CENT. CODE §§ 14-02.1-02(11)(a); 14-02.1-03(1).

Most women who choose to have abortions obtain them only after six weeks lmp. According to the three most recent years of Induced Termination of Pregnancy Reports made available by the North Dakota Department of Health, ninety-one percent of abortions provided in the state occurred at and after six weeks lmp. *See http://ndhealth.gov/vital/pubs.htm*.[2]

Red River Women's Clinic serves women from throughout North Dakota and surrounding states. Kromenaker Decl. at ¶ 4. Due to the small population of the area, however, the Clinic typically provides abortions only one day per week. Kromenaker Decl. at ¶ 4.

## II. ARGUMENT

Summary judgment is proper if, "after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Rau v. Roberts*, 640 F.3d 324, 327 (8th Cir. 2011) (quoting *Hayek v. City of St. Paul*, 488 F.3d 1049, 1054 (8th Cir. 2007)); *see* Fed. R. Civ. P. 56(a), (c). Only those facts that "might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). Although the burden of demonstrating that there are no such material facts rests on the movant, "a nonmovant may not rest upon mere denials or allegations." *Rau*, 640 F.3d at 327 (quoting *Wingate v. Gage Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1078–79 (8th Cir.

---

[2] Every abortion performed in North Dakota must be reported using a form provided by the Department of Health. N.D. CENT CODE §§ 14-02.1-02.2; 14-02.1-07. The completed form includes the gestational age at which the abortion was performed. The State compiles this information and reports it on an annual basis. Because it appears that the Clinic is the only provider reporting abortions in North Dakota, these statistics reflect the percentage of women currently obtaining abortions at and after 6 weeks lmp at the Clinic. Kromenaker Decl. at ¶ 6.

2008)).    Rather, the nonmovant "must go beyond the pleadings and submit affidavits, depositions, answers to interrogatories, or admissions on file and designate specific facts identifying the genuine issue of material fact that should go to trial."  *Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 831–32 (8th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); *see* Fed. R. Civ. P. 56(e).

Summary judgment for the Plaintiffs is proper here because Defendants cannot dispute that HB 1456, by prohibiting abortions when embryonic or fetal cardiac activity is detectable, prohibits the performance of abortions beginning at approximately six weeks lmp, which is well before viability.  Unavailing legal arguments that the law is nonetheless constitutional because it does not ban all abortions and contains exceptions do not alter this one critical material fact.

### A.  House Bill 1456 Violates the Substantive Due Process Rights of Women Seeking Abortions.

The Constitution protects a woman's decision to terminate her pregnancy.  *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846-47 (1992) (plurality decision) (describing it as one of the substantive liberties protected by the Due Process Clause of the Fourteenth Amendment to the Constitution).  *See also Lawrence v. Texas*, 539 U.S. 558, 565 (2003) (the right to abortion has "real and substantial protection as an exercise of [a woman's] liberty under the Due Process Clause").  The Court has explained the constitutional underpinnings of the fundamental right of each woman to determine the course of her pregnancy before viability:

> [T]he liberty of the woman is at stake in a sense unique to the human condition and so unique to the law.  The mother who carries a child to full term is subject to anxieties, to physical constraints, to pain that only she must bear. . . .   Her suffering is too intimate and personal for the State to insist, without more, upon its own vision of the woman's role, however dominant that vision has been in the course of our history and our culture.  The destiny of the woman must be shaped to a large extent on her own conception of her spiritual imperatives and her place in society.

*Casey*, 505 U.S. at 852.  The Court has further recognized that:  "The ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives."  *Id. at* 856 (citation omitted).

### 1.   HB 1456 bans abortion prior to viability and is therefore *per se* unconstitutional.

The core principle of the substantive due process protection afforded to women seeking abortion is that:  "Regardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability."  *Casey*, 505 U.S. at 879 (affirming the "central holding of *Roe v. Wade*[, 410 U.S. 113, 163-64 (1973)]").  *See also*, *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007) (assuming the principle that, "[b]efore viability, a State 'may not prohibit any woman from making the ultimate decision to terminate her pregnancy'") (quoting *Casey*, 505 U.S. at 879); *Stenberg v. Carhart*, 530 U.S. 914, 921 (2000) (declining to "revisit" the legal principles reaffirmed in *Casey* that "before 'viability . . . the woman has a right to choose to terminate her pregnancy.'") (quoting *Casey*, 505 U.S. at 870).[3]

Although the Supreme Court has recognized that a State's interest in protecting the health of the woman and the potential life of the fetus are present from the outset of pregnancy, before viability these interests "are not strong enough to support a prohibition of abortion."  *Casey*, at 846; *see also id.* at 860 ("viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions").  *See also Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1456 (8th Cir. 1995) (acknowledging the State's interests in maternal health and fetal life, but noting that "[b]efore

---

[3] After viability, the State may prohibit abortions, so long as the law "contains exceptions for pregnancies which endanger the woman's life or health."  *Casey*, 505 U.S. at 846.

viability . . . 'the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure'") (quoting *Casey*, 505 U.S. at 846); *Isaacson v. Horne*, 716 F.3d 1213, 1228-29 (9th Cir. 2013), *petition for cert. filed* (Sept. 27, 2013) (No. 13-404) (rejecting State's asserted interest in maternal health as an adequate justification for banning pre-viability abortions at 20 weeks lmp).

Viability is the point in pregnancy "at which there is a realistic possibility of maintaining and nourishing a life outside the womb." *Casey*, 505 U.S. at 870. While advances in neonatal care may with time move the point of viability to earlier in the pregnancy, as a matter of law, viability continues to serve as the critical fact in assessing the constitutionality of a State's prohibition on abortion. *See Casey*, 505 U.S. at 860. Nor can a State dictate where the point of viability lies, because "the determination of whether a particular fetus is viable is, and must be, a matter for the judgment of the responsible attending physician." *Colautti*, 439 U.S. at 396 (quoting *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 64 (1976)); *see also Colautti*, 439 U.S. at 388-89 ("Because [the point of viability] may differ with each pregnancy, neither the legislature nor the courts may proclaim one of the elements entering into the ascertainment of viability—be it weeks of gestation or fetal weight or any other single factor—as the determinant of when the State has a compelling interest in the life or health of the fetus").

Recently, the Ninth Circuit invalidated an Arizona law prohibiting abortion beginning at 20 weeks lmp, with limited exceptions, noting that:

> Since *Roe v. Wade*, . . . the Supreme Court case law concerning the constitutional protection accorded women with respect to the decision whether to undergo an abortion has been unalterably clear regarding one basic point, although it has varied in other respects: a woman has a constitutional right to choose to terminate her pregnancy before the fetus is viable. A prohibition on the exercise of that right is *per se* unconstitutional. While the state may *regulate* the mode and manner of abortion prior to fetal viability, it may not *proscribe* a woman from electing abortion, nor may it impose an undue burden on her choice through regulation.

*Isaacson*, 716 F.3d at 1217.  *See also id.* (noting with respect to law's "medical emergency exception": "Allowing a *physician* to decide if abortion is medically necessary is not the same as allowing a *woman* to decide whether to carry her own pregnancy to term") (emphasis in original).

As with the Arizona law, HB 1456 prohibits pre-viability abortion, and is therefore *per se* unconstitutional.

## 2. HB 1456 imposes an undue burden on women seeking pre-viability abortions.

House Bill 1456 is also unconstitutional because it imposes an undue burden on the right of a woman to terminate her pregnancy prior to viability.  *See Gonzales*, 550 U.S. at 146 ("Before viability, a State 'may not prohibit any woman from making the ultimate decision to terminate her pregnancy.'  It also may not impose upon this right an undue burden . . . .") (internal citation omitted) (quoting *Casey*, 505 U.S. at 879).  "An undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability."  *Casey*, 505 U.S. at 878.  *See also Planned Parenthood of Sioux Falls v. Miller*, 63 F.3d 1453, 1459 (8th Cir. 1995)) (same).  There can be no doubt that H.B. 1456, by making it a felony offense for a physician to perform an abortion after embryonic or fetal cardiac activity can be detected, places a substantial, indeed insurmountable obstacle in the path of women seeking pre-viability abortions after that point in pregnancy.  *See Miller*, 63 F.3d at 1465 (law that would have a "profound chilling effect on the willingness of physicians to perform abortions" "creates a substantial obstacle to a woman's right to have a pre-viability abortion").

Here, Plaintiffs have brought a pre-enforcement challenge to the Act, seeking to have it declared unconstitutional as-applied to pre-viability abortions.  Compl. at 2, 10, ECF No. 1.

Ultimately, however, whether a challenge is identified as facial or as-applied is of little relevance.  As the Eighth Circuit recently observed:

> The 'label is not what matters.' *Doe v. Reed,* ⸺ U.S. ⸺, 130 S.Ct. 2811, 2817 (2010); *see Citizens United,* 558 U.S. at 331("[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge."). The "important" inquiry is whether the "claim and the relief that would follow ... reach beyond the particular circumstances of the[ ] plaintiffs." *Reed,* 130 S.Ct. at 2817.

*Iowa Right to Life Comm., Inc. v. Tooker*, 717 F.3d 576, 587 (8th Cir. 2013) (additional citations omitted).

In the Eighth Circuit, a law restricting abortion is invalid if it "will operate as a substantial obstacle to a woman's choice to undergo an abortion 'in a large fraction of the cases in which [it] is relevant.'"  *Miller*, 63 F.3d at 1458 (quoting *Casey*, 505 U.S. at 895).  In determining whether a law will operate as a substantial obstacle, "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant."  *Casey*, 505 U.S. at 894; *Miller*, 63 F. 3d at 1458.

Here the group for whom the law is relevant is women seeking pre-viability abortions at or after the point in pregnancy when embryonic or fetal cardiac activity is detectable who do not come within the Act's narrow exception.  For every woman in the group, HB 1456 operates as a complete bar, and therefore a substantial obstacle, to her choice to have an abortion.  There can be no question that HB 1456 operates as a substantial obstacle for a large fraction of women seeking abortions that are prohibited under the Act – 100% of the women in the group will be unable to obtain an abortion.

Other courts reviewing outright pre-viability bans have invalidated the laws for imposing undue burdens.  *See Jane L. v. Bangerter*, 102 F.3d 1112, 1117-18 (10th Cir. 1996) (finding a

9

ban on abortions after 22 weeks lmp an undue burden on a woman's right to access pre-viability abortions), *cert. denied,* 520 U.S. 1274 (1997); *Sojourner T. v. Edwards,* 974 F.2d 27, 31 (5th Cir. 1992) (holding a ban on abortion with limited exceptions "plainly unconstitutional under *Casey* because the statute imposes an undue burden on women seeking an abortion before viability"), *cert. denied,* 507 U.S. 972 (1993); *McCormack v. Hiedeman,* 900 F. Supp. 2d 1128, 1151 (D. Idaho 2013) ("Because it appears [an Idaho law] was enacted with the specific purpose of placing an insurmountable obstacle in the path of women seeking an abortion after twenty weeks, but before the fetus has attained viability, the section imposing the categorical ban is unconstitutional"); *Edwards v. Beck,* ___ F. Supp. 2d ___, 2013 WL 2302323 *5 (E.D. Ark., May 23, 2013) (issuing a preliminary injunction against a 2013 Arkansas law prohibiting abortions if a heartbeat is detected and the pregnancy is twelve weeks or more, finding that Plaintiffs had established a likelihood of success on the merits of their claim that the law will create a substantial obstacle for a large fraction of women seeking pre-viability abortions).

Accordingly, because it imposes an undue burden on virtually all women seeking pre-viability abortions at or after the point in pregnancy when a heartbeat is detected, HB 1456 violates the Due Process Clause of the Fourteenth Amendment, *Casey*, 505 U.S. at 846, and should be invalidated as-applied to pre-viability abortions.

### B.   House Bill 1456 Violates the Equal Protection Rights of Women Seeking Abortion By Discriminating Against Them on the Basis of Sex.

House Bill 1456 runs afoul of the equal protection guarantees of the Fourteenth Amendment because it imposes burdens on women's liberty that are not justified based on permissible distinctions between the two sexes.  The Equal Protection Clause of the Fourteenth Amendment requires "close judicial scrutiny" of statutory classifications based on sex. *Frontiero v. Richardson*, 411 U.S. 677, 682 (1973); *Reed v. Reed*, 404 U.S. 71, 75 (1971) (a

statute that "provides that different treatment be accorded . . . on the basis of . . . sex . . . establishes a classification subject to scrutiny under the Equal Protection Clause").  Here, by depriving only women, but not men, of the right to make an important medical decision, and justifying this deprivation based on outdated stereotypes of women's abilities and place in society, the State has created an impermissible sex-based classification.

"Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action."  *U.S. v. Virginia*, 518 U.S. 515, 531 (1996) (hereinafter *VMI*).  "The burden of justification is demanding and it rests entirely on the State."  *Id.* at 533 (citing *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)).  "The State must show at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."  *VMI*, 518 U.S. at 533 (internal quotation marks and citations omitted).  "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation."  *Id.* (citations omitted).  "[T]he mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme."  *Hogan*, 458 U.S. at 728 (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 (1975)).

Gender-based classifications are subject to heightened scrutiny "in recognition of the real danger that government policies that professedly are based on reasonable considerations in fact may be reflective of archaic and overbroad generalizations about gender, or based on outdated misconceptions concerning the role of females in the home rather than in the marketplace and world of ideas."  *J.E.B. v. Alabama*, 511 U.S. 127, 130 (1994) (internal quotation marks and citations omitted).  *See also VMI*, 518 U.S. at 531 ("Today's skeptical scrutiny of official action

denying rights or opportunities based on sex responds to volumes of history. . . . '[O]ur Nation has had a long and unfortunate history of sex discrimination.") (quoting *Frontiero,* 411 U.S. at 684). *Frontiero,* 411 U.S. at 684; Decl. of Linda K. Kerber, Ph.D., attached as Exh. 4 to Pls.' Mot. for Summ. J. ("Kerber Decl.") at ¶¶ 6, 8, 11, 13, 16-19, 21-22, 26-27.

Thus, the State's justification for the gender-based statute "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *VMI*, 518 U.S. at 533 (citations omitted). "If the statutory objective is to exclude or 'protect' members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior, the objective itself is illegitimate." *Hogan*, 458 U.S. at 725 (citing *Frontiero*, 411 U.S. at 684-85 (noting that traditionally, discrimination against women "was rationalized by an attitude of 'romantic paternalism' which, in practical effect, put women, not on a pedestal, but in a cage")). Review of assumptions based on stereotypes is not limited to the State's justification, but also requires the court to analyze if there is a substantial fit between *means* and ends. *See Hogan*, 482 U.S. at 725-26 ("[t]he purpose of requiring that close relationship is to assure that the validity of a classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women").

Applying heightened scrutiny, the Supreme Court has invalidated both state and federal statutes that burdened one sex and that relied on and reinforced gender stereotypes about women's role in society. For example, in *Wiesenfeld*, 420 U.S. 636, the Court held that a provision of the Social Security Act providing spousal survivor benefits to women but not to men was invalid. According to the Court, an "archaic and overbroad generalization not tolerated under the Constitution underlies the distinction drawn by [the challenged provision], namely, that

12

male workers' earnings are vital to the support of their families, while the earnings of female wage earners do not significantly contribute to their families' support." *Id.* at 643 (internal quotation marks and citation omitted). In *Orr v. Orr*, the Court invalidated Alabama's alimony statutes, which provided that husbands, but not wives, may be required to pay alimony upon divorce, noting that "[l]egislative classifications which distribute benefits and burdens on the basis of gender carry the inherent risk of reinforcing the stereotypes about the 'proper place' of women and their need for special protection." 440 U.S. 268, 283 (1979) (citation omitted). In *Califano v. Westcott*, the Court concluded that provision of benefits under the Aid to Families with Dependent Children program to children deprived of parental support because of an unemployed father but not an unemployed mother, was not substantially related to an important government interest, but rather, was "part of the baggage of sexual stereotypes that presumes the father has the primary responsibility to provide a home and its essentials." 443 U.S. 76, 89 (1979) (internal quotation marks and citations omitted). *See also J.E.B.*, 511 U.S. at 137-38 (Alabama's justification for gender-based peremptory challenges in trials – which was that men and women react differently to the accused in a paternity and child support suit - was based on "outmoded notions of the relative capabilities of men and women") (citation omitted); *VMI*, 518 U.S. at 541-42 (exclusively male admission policy of Virginia's public military college violated the Equal Protection Clause, and the State's proffered justification that women are ill-suited to the college's adversarial method of training was based on overbroad generalizations).

Here, Defendants cannot meet their burden of justifying HB 1456's discriminatory treatment of women, and because the issue can be decided as a matter of law based on uncontestable facts, Plaintiffs are entitled to summary judgment.

**1.  HB 1456 violates equal protection by limiting women's, but not men's, ability to make medical decisions.**

The State asserts that HB 1456 protects "the physical and mental health of women who may seek to procure an abortion."  Resp. in Opp. to Mot. for Prelim. Inj. ("Defs.' Opp.") at 15, ECF No. 23.  But prohibiting most abortions in the State is not substantially related to the purpose of protecting women's physical and mental health, and relies on and reinforces impermissible stereotypes about women.

A woman who is pregnant faces risks to her health whether she terminates the pregnancy or carries to term.  The State seeks to deny women the ability, available to men, to balance the risks and benefits of a course of medical treatment, substituting instead, the legislature's (ill-informed) judgment that once an embryonic or fetal heartbeat has been detected, women must accept the risks of pregnancy over abortion.  By justifying HB 1456 on maternal health grounds, the State is forcing women to accept its decision in this matter, thereby denying women the ability to act autonomously.  The State imposes no such limitations on men making medical decisions.

As an initial matter, the Court need not accept the state's purported purpose.  Here, the State's asserted justification of HB 1456 on maternal health grounds cannot survive the "skeptical scrutiny" applicable to sex-based discrimination because these claims appear to have been constructed solely for the purpose of litigation.  Prior to the passage of HB 1456 and this challenge, the State did not hold these views.  Materials created by the North Dakota Department of Health,[4] for the explicit purpose of providing information to women seeking abortions, state:

---

[4] N.D. CENT CODE § 14-02.1-02.1(1)(d) mandates the Department of Health to publish materials "that contain objective information" describing "the immediate and long-term medical risks commonly associated with each abortion method," and "the medical risks associated with carrying a child to term."

"Abortion is generally a safe procedure, but complications can occur. Abortion procedures later in pregnancy are more complicated and are associated with higher risks."  Information About Pregnancy      and      Abortion,      North      Dakota      Dept.      of      Health, http://www.ndhealth.gov/familyhealth/preg_abortion_booklet_final.pdf at 17.  This information, endorsed by the State of North Dakota, and which the Clinic is required by law to give to every patient, N.D. CENT. CODE § 14-02.1-02(11)(b)(2), undermines the State's purported justification for the Act, demonstrating that it cannot meet its burden to show that the "classification serves important governmental objectives."  *VMI*, 518 U.S. at 533 ("The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation.") (citations and internal punctuation omitted.

There is nothing unique about the medical risks associated with abortion or carrying a pregnancy to term that justifies the absolute control that the State seeks to impose.  Even accepting, only for the sake of argument, the State's assertions regarding the risks of abortion, there is no medical basis to distinguish abortion from other medical procedures.  As the Supreme Court has recognized, motherhood itself places unique burdens on women and entails physical risks.[5]  *See Casey*, 505 U.S. at 852 ("The mother who carries a child to full term is subject to anxieties, to physical constraints, [and] to pain that only she must bear.").  As Judge Kleinfeld recently noted:  "As for [the State's] claimed interest in the mother's health, people are free to do many things risky to their health, such as surgery to improve their quality of life but unnecessary to preserve life. There appears to be no authority for making an exception to this general liberty

---

[5] In 2011, 28.8% of women carrying to term in North Dakota underwent c-section surgery during delivery.  North Dakota Department of Health Division of Vital Records, Caesarean Section Report – 2011, http://ndhealth.gov/vital/pubs/csec2011.pdf.  "The risk of death during childbirth is about 12 per 100,000."  Information About Pregnancy and Abortion, North Dakota Dept. of Health,  http://www.ndhealth.gov/familyhealth/preg_abortion_booklet_final.pdf, at 12.

regarding one's own health for abortion." *Isaacson v. Horne*, 716 F.3d at 1235 (Kleinfeld, J. concurring).

The State's assertion that it is acting to protect women from abortion by denying them access to the procedure manifests the kind of "romantic paternalism" that the Supreme Court has found to violate equal protection. *See Frontiero*, 411 U.S. at 684. Women are just as capable as men of weighing the risks and benefits of medical treatment thus, the State's determination that women need the State to do their thinking for them, regarding a choice that only they may make, runs afoul of the Supreme Court's directive that women cannot be treated differently from men based on assumptions about their abilities. *Id.* at 686-87 (since sex is an "immutable characteristic" "the imposition of special disabilities upon the members of a particular sex because of their sex would seem to violate 'the basic concept of our system that legal burdens should bear some relationship to individual responsibility,'" and "statutory distinctions between the sexes often have the effect of invidiously relegating the entire class of females to inferior legal status without regard to the actual capabilities of its individual members) (citations omitted).

The justification of HB 1456 on the grounds that the State wishes to "protect" women from the dangers of abortion relegates women to an inferior class – one not capable of understanding and/or weighing the risks associated with abortion versus carrying to term, and therefore in need of legislative protection. *See* Kerber Decl. at ¶¶ 10-11 (discussing how laws premised on women's need for protection and their perceived "emotional and irrational" natures, "undermined [women's] access to the political, social and civil rights that are required to participate fully in society"). The State's defense therefore relies on "overbroad generalizations about the different talents, capacities, or preferences of males and females," that the Court has

repeatedly rejected as sufficient for the State to meet its significant burden to show that the law "serves important governmental objectives."   *VMI*, 518 U.S. at 533.   *See also Nev. Dept. of Human Resources v. Hibbs*, (hereinafter "*Hibbs*") 538 U.S. 721, 729 (2003) (same).

Nor can the State save the Act by arguing that the Supreme Court itself has recognized the interest in maternal health as important in the context of abortion.  The Supreme Court has never held – or even debated – that this interest is sufficient to justify gender discrimination. Rather, the Court has recognized that only reasonable regulations, well short of a ban such as HB 1456, may further this interest.  *See, e.g.*, *Casey*, 505 U.S. at 878 ("As with any medical procedure, the State may enact regulations to further the health or safety of a woman seeking an abortion.   Unnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right.").

This conclusion is underscored by the Supreme Court's recognition that the decision whether or not to terminate a pregnancy has implications for women that go far beyond the potential health risks associated with abortion or carrying to term, and involve "the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy."  C*asey*, 505 U.S. at 851.  With HB 1456, the State would deny women not just the right to weigh the relative health risks of pregnancy and abortion, but also the right to consider any factor other than health risks, including whether another child would jeopardize their ability to support and parent existing children, or prevent them from pursuing employment or education. Kromenaker Decl. at 5; Eggleston Decl. at 15.

Finally, even assuming some legitimacy in the State's asserted concerns for maternal health, HB 1456 still fails as a gender-based classification.  "The State must show at least that the challenged classification serves important governmental objectives and that the

discriminatory means employed are substantially related to the achievement of those objectives." *VMI*, 518 U.S. at 533 (citations and internal punctuation omitted).  Here, the means employed are so onerous they are not reasonably, much less substantially related to the State's asserted interest, and appear to be nothing more than a pretext to ban abortion.  "Eliminating or reducing women's reproductive choices is manifestly *not* a means of protecting them.  When safe abortion procedures cease to be an option, many women seek other means to end unwanted or coerced pregnancies."  *Gonzales v. Carhart*, 550 U.S. 124, 184 n.9   (2007) (Ginsburg, J., dissenting) (emphasis in original).

The fact that the State seeks, through H.B. 1456 to "protect" women by taking away their ability to make decisions about abortion, renders it invalid under the Equal Protection Clause.

### 2.  HB 1456 violates equal protection by denying women the ability to participate equally in society.

Defendants also seek to justify the Act by asserting an interest in potential life.  Defs.' Opp. at 15.  In the context of equal protection, this justification is inextricably entwined with stereotypical assumptions about women's roles as mothers.  Defendants' position – that women who do not terminate early enough in pregnancy to avoid the ban should be forced to carry to term – relies on and perpetuates the stereotype that a woman's domestic obligations trump her desire for autonomy and her equal participation in society.   The State seeks to impose these burdens on women based on their sex and for which no equivalent burden is placed on men. This is an impermissible gender-based classification.  *See J.E.B.*, 511 U.S. at 135 (heightened scrutiny is applied to gender-based classifications due to concerns that they are based on "archaic and overbroad generalizations about gender, or based on outdated misconceptions concerning the role of females in the home rather than in the marketplace and world of ideas.") (citations and internal punctuation omitted).

The Supreme Court has recognized that state action that deprives women of the ability to participate equally in society is sex discrimination. As the Court explained in *VMI*, it has "repeatedly recognized that neither federal nor state government acts compatibly with the equal protection principle when a law or official policy denies to women, simply because they are women, full citizenship stature—equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities." 518 U.S. at 532 (citations omitted).

Denying women access to pre-viability abortions denies women, but not men, the ability to participate fully and equally in society by limiting their ability to chart the course of their lives through control over the timing, spacing, and number of children they wish to bear. By forcing women with unwanted pregnancies to carry to term despite the impact on their ability to pursue educational and employment opportunities, HB 1456 relies on and perpetuates the stereotype that women's obligation as mothers trumps their desire for autonomy and their obligations as citizens. These stereotypes have animated laws throughout our Nation's history, justifying restrictions on women's equal participation in society. *See* Kerber Decl at ¶¶ 14-15, 25, 29.

The Supreme Court has itself recognized the role of this stereotype, and its impact on women's equality. In upholding provisions of the Family and Medical Leave Act that permits private rights of action against state employers, the Court cited favorably Congressional findings that the impact of gender-based discrimination resulting from the stereotype of women as mothers first "is significant":

> Historically, denial or curtailment of women's employment opportunities has been traceable directly to the pervasive presumption that women are mothers first, and workers second. This prevailing ideology about women's roles has in turn justified discrimination against women when they are mothers or mothers-to-be.

*Hibbs*, 538 U.S. at 736 (quoting *The Parental and Medical Leave Act of 1986: Joint Hearing*

*before the Subcommittee on Labor–Management Relations and the Subcommittee on Labor Standards of the House Committee on Education and Labor*, 99th Cong., 2d Sess., 100 (1986)).

Laws restricting reproductive rights, in particular, have been motivated by a desire to maintain women in their traditional roles of mothers.  Kerber Decl. at ¶ 14 ("The reasoning behind the prohibition on abortion and all forms of birth control that spread in the mid-nineteenth century was, with few exceptions, based on arguments that women had to be required to accept their exclusive devotion to motherhood").  In the specific context of access to abortion, the Supreme Court has recognized that:

> [S]ince *Roe*, "people have organized intimate relationships and made choices that define their views of themselves and their places in society in reliance on the availability of abortion in the event that contraception should fail.  The ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives.

*Casey*, 505 U.S. at 856 (citing Rosalind Petchesky, *Abortion and Woman's Choice* 109, 133, n.7 (rev. ed. 1990)).[6]  *See also Casey*, 505 U.S. at 852 (that the burden of motherhood is unique to women "cannot alone be grounds for the State to insist she make the sacrifice.  Her suffering is too intimate and personal for the State to insist, without more, upon its own vision of the woman's role, however dominant that vision has been in the course of our history and our culture.  The destiny of a woman must be shaped to a large extent on her own conception of her spiritual imperatives and her place in society."); *VMI*, 581 U.S. at 533-34 ("Inherent differences

---

[6] Research supports the Supreme Court's recognition that women seek abortions in order to attain their educational goals, to work, to earn their desired income, and to achieve other life goals.  *See* Finer, L., et al., Reasons U.S. Women Have Abortions:  Quantitative and Qualitative Perspectives, Persp. On Sexual and Reprod. Health, Vol. 37, No. 3 (Sept. 2005) 110-18 (38% of women seeking abortions stated that having a baby would interfere with education and 38% stated that having a baby would interfere with their job or career).  *See also*, Angrist, J. and Evans, W., "Schooling and Labor Market Consequences of the 1970 State Abortion Reforms, NBER Working Paper 5406 (1996) (exposure to liberal abortion laws translated for black women "into large and statistically significant  increases in high school graduation rates, college attendance rates, and employment rates.").

between men and women" cannot be used "for denigration of the members of either sex or for artificial constraints on an individual's opportunity.  Sex classifications . . . may not be used, as they once were, to create or perpetuate the legal, social, and economic inferiority of women.") (citations and internal punctuation omitted).

The effect of HB 1456 is to deny women, but not men, the ability to participate equally in society.  The State's asserted interest in potential life cannot be separated from the underlying assumptions, inherent in legislation that forces women to carry pregnancies to term, that a women's primary role is that of childbearer and mother.  Indeed, the State has submitted and relied on the South Dakota Task Force Report on Abortion, Defs.' Opp. at 7 (citing Defs.' Opp. Ex. H, ECF No. 23-14), which states as to a woman's decision to "waive" her right to a relationship with the embryo or fetus through abortion:

> [T]his method of waiver of the mother's rights expects far too much of the mother.  It is so far outside the normal conduct of a mother to implicate herself in the killing of her own child.  Either the abortion provider must deceive the mother into thinking that the unborn child does not yet exist, and thereby induce her consent without being informed, or the abortion provider must encourage her to defy her very nature as a mother to protect her child.

Defs.' Opp. Ex. H at 56.  The State's reliance on this report makes manifest that HB 1456 is founded on stereotypical assumptions regarding women's role in society, which are inseparably intertwined with the asserted interest in fetal life.

As with the asserted interest in maternal health, these generalized assumptions do not satisfy the State's heavy burden to show that the law both substantially relates to "important governmental objectives" and that it is not based on "overbroad generalizations" about the proper role of women in society.  As a result, Plaintiffs are entitled to summary judgment on their claim that HB 1456 violates the equal protection rights of women seeking pre-viability abortions in North Dakota.

21

**CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Summary Judgment, declare HB 1456 unconstitutional, and enter a permanent injunction prohibiting its enforcement as applied to pre-viability abortions.


Respectfully submitted this 15th day of October, 2013.

> /s/ Janet Crepps
> *Janet Crepps
> *David Brown
> Center for Reproductive Rights
> 120 Wall Street, 14th Floor
> New York, NY 10005
> jcrepps@reprorights.org
> Tel: 864-962-8519
> dbrown@reprorights.org
> Tel: 917- 637-3653
> *Admitted *pro hac vice*
>
> Rebecca S. Thiem
> Zuger Kirmis & Smith
> PO Box 1695
> 316 North Fifth Street
> Bismarck, ND 58502-1695
> rthiem@zkslaw.com
> Tel: 701-223-2711
>
> Thomas A. Dickson
> Dickson Law Office
> 1715 Burnt Boat Drive, Madison Suite
> P.O. Box 1896
> Bismarck, North Dakota 58502
> tdickson@dicksonlaw.com
> Tel: 701-222-4400

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2013, I electronically filed the foregoing Motion and

Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment with

accompanying exhibits with the clerk of court using the Court's CM/ECF system, which will

send a notice of electronic filing to:

Birch Burdick
Cass County State's Attorney
P.O. Box 2806
Fargo, ND 58107-2806
sa-defense-notices@casscountynd.gov

Ronald F. Fischer
Daniel L. Gaustad
Joseph E. Quinn
Special Assistant Attorneys General
Pearson, Christensen & Clapp, PLLP
24 North 4th Street
P.O. Box 5758
Grand Forks, ND 58206-5758
rfischer@grandforkslaw.com
dan@grandforkslaw.com
jquinn@grandforkslaw.com

COUNSEL FOR DEFENDANTS

/s/ David Brown
*David Brown
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
dbrown@reprorights.org
Tel: 917- 637-3653
*Admitted *pro hac vice*

COUNSEL FOR PLAINTIFFS