**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| MKB Management Corp., d/b/a Red River Women's Clinic; and Kathryn L. Eggleston, M.D., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | **ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | ) ) | |
| | ) | |
| Birch Burdick, in his official capacity as State's Attorney for Cass County, et al., | ) ) | |
| | ) | Case No. 1:13-cv-071 |
| Defendants. | ) | |

Before the Court is the "Plaintiffs' Motion for Summary Judgment" filed on October 15, 2013. <u>See</u> Docket No. 40. The Defendants filed a response on January 17, 2014. <u>See</u> Docket No. 69. The Plaintiffs filed a reply brief on February 24, 2014. <u>See</u> Docket No. 96. A hearing on the motion was held on April 4, 2014, in Bismarck, North Dakota. The threshold question is whether the Legislative Assembly of North Dakota can prohibit abortions beginning at six weeks gestation and before the fetus is viable. The United States Supreme Court has clearly spoken and held it is not constitutionally permissible to do so. For the reasons set forth below, the Plaintiffs' motion for summary judgment is **GRANTED**.

I.      <u>**BACKGROUND**</u>

The Plaintiff, MKB Management Corp., doing business as Red River Women's Clinic ("the Clinic"), is the only clinic providing abortions in North Dakota. The Plaintiff, Kathryn Eggleston, is a board-certified family medicine physician licensed in North Dakota. Dr. Eggleston is the Clinic's medical director and has been providing reproductive health care for women, including abortions, colposcopy services, and family planning services, for over a decade. The Defendants

include various North Dakota officials, including:  Birch Burdick, the Cass County State's Attorney; Wayne Stenehjem, the Attorney General for the State of North Dakota; and the thirteen members of the North Dakota Board of Medical Examiners.  All Defendants are sued in their official capacity.

The Plaintiffs challenge the constitutionality of House Bill 1456 ("H.B. 1456"), codified at North Dakota Century Code Chapter 14-02.1, which provides as follows:

> **Determination of detectable heartbeat in unborn child before abortion-Exception.**
> Except when a medical emergency exists that prevents compliance with this subsection, an individual may not perform an abortion on a pregnant woman before determining, in accordance with standard medical practice, if the unborn child the pregnant woman is carrying has a detectable heartbeat.  Any individual who performs an abortion on a pregnant woman based on the exception in this subsection shall note in the pregnant woman's medical records that a medical emergency necessitating the abortion existed.
>
> * * *
>
> **Abortion after detectable heartbeat in unborn child prohibited–Exception–Penalty.**
> Notwithstanding any other provision of law, an individual may not knowingly perform an abortion on a pregnant woman with the specific intent of causing or abetting the termination of the life of the unborn child the pregnant woman is carrying and whose heartbeat has been detected according to the requirements of [the above section] of this Act.

H.B. 1456, 63d Leg. Assemb., Reg. Sess. (N.D. 2013).  H.B. 1456, passed during the 2013 legislative session, makes it a criminal offense to perform an abortion if a "heartbeat" has been detected, thereby banning abortions beginning at approximately six weeks of pregnancy, with limited exceptions. The amendments contained in H.B. 1456 were scheduled to take effect on August 1, 2013.  However, on July 22, 2013, this Court issued a preliminary injunction enjoining the implementation of the law.  <u>See</u> Docket No. 25.

2

At the present time, North Dakota law prohibits abortions "[a]fter the point in pregnancy when the unborn child may reasonably be expected to have reached viability," unless "in the medical judgment of the physician the abortion is necessary to preserve the life of the woman or if in the physician's medical judgment the continuation of her pregnancy will impose on her a substantial risk of grave impairment of her physical or mental health."  N.D.C.C. § 14-02.1-04(3). Viability is defined as "the ability of an unborn child to live outside the mother's womb, albeit with artificial aid."  N.D.C.C. § 14-02.1-02(14) (to be recodified by H.B. 1305 as N.D.C.C. § 14-02.1-02(16)).  H.B. 1456 would prohibit abortions after a heartbeat is detected, which all agree can occur as early as six weeks after a woman's last menstrual period.

The Plaintiffs initially requested preliminary injunctive relief to restrain the Defendants from enforcing H.B. 1456, which would essentially ban all abortions in the State of North Dakota. The Plaintiffs contend the North Dakota statute is an unconstitutional abridgment of the right to abortion protected under the Fourteenth Amendment of the United States Constitution.  H.B. 1456 also puts restraints on physicians in performing abortions by providing criminal punishment.  A physician who knowingly violates the ban by performing an abortion when a heartbeat has been detected may face Class C felony charges, punishable by up to five years in prison.  H.B. 1456 § 2(4) (referencing N.D.C.C. § 12.1-32-01(4)).  Failure to determine whether a heartbeat is detectible is punishable through a disciplinary action against a physician by the North Dakota Board of Medical Examiners, which can include suspension or revocation of the physician's license.  H.B. 1456 §§ 1(2), 3 (creating a new subsection to N.D.C.C. § 43-17-31); N.D.C.C. § 43-17-31 (referencing N.D.C.C. § 43-17-30.1).

3

Since the issuance of a preliminary injunction on July 22, 2013, the parties have engaged in limited discovery and conducted depositions of several key witnesses.

## II.   LEGAL DISCUSSION

### A.   STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates no genuine issues of material fact exist and, therefore, the moving party is entitled to judgment as a matter of law.  Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(a).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.  Id.

The Court must inquire whether the evidence presents sufficient disagreement to require the submission of the case to a jury or if it is so one-sided that one party must prevail as a matter of law.  Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005).  The moving party bears the burden of demonstrating an absence of a genuine issue of material fact.  Simpson v. Des Moines Water Works, 425 F.3d 538, 541 (8th Cir. 2005), *abrogated on other grounds by* Torgerson v. City of Rochester, 643 F.3d 1031 (8th Cir. 2011).  The non-moving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial.  Fed. R. Civ. P. 56(c)(1).  The court must consider the substantive standard of proof when ruling on a motion for summary judgment.  Anderson, 477 U.S. at 252.

4

B.      **DECLARATIONS OF OB/GYN SPECIALISTS**

The Plaintiffs contend H.B. 1456 is unconstitutional on its face because it bans abortions prior to viability.  Given controlling United States Supreme Court precedent, the Plaintiffs contend that H.B. 1456 violates the substantive due process rights of their patients.  If H.B. 1456 is allowed to take effect, nearly 100% of the abortions currently performed at the Red River Women's Clinic, the sole clinic providing abortions in North Dakota, will be prohibited.  The Defendants have recently taken the position that viability of a fetus occurs at the moment of conception, which would result in a prohibition of all abortions in North Dakota.

Despite the newly-adopted position that viability occurs at the point of conception, the Defendants argue H.B. 1456 does not ban all abortions prior to viability because abortions can be performed up until the point at which a fetal heartbeat is detected and, therefore, is constitutional. The Defendants opine H.B. 1456 limits pre-viability abortions after detection of the fetal heartbeat pursuant to the State's interest "in protecting the life of the fetus that may become a child . . . ." Gonzales v. Carhart, 550 U.S. 124, 158 (2007).

The Defendants also argue a woman's right to abortion before viability is not absolute and must be weighed against the state's interest in protecting the fetus and the mother.  According to the Defendants', the fact that H.B. 1456 serves a valid purpose -- to further the state's interest in protecting the life of the unborn, protecting the physical and mental health of women who may seek to procure an abortion, preserving the integrity of the medical profession, preventing the coarsening of society's moral sense and promoting respect for human life -- "not designed to strike at the right itself, [but which] has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." Id. at 157-58 (quoting Planned

Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 874 (1992)).  While the Defendants are correct that a state's interests must also be examined in the abortion debate, the state's interest cannot unduly burden a woman's right to choose.

In support of the motion for summary judgment, the Plaintiffs submitted declarations of two physicians practicing medicine in North Dakota in the fields of obstetrics and gynecology. Kathryn Eggleston, M.D. has been the medical director of the Red River Women's Clinic since 2008.  Dr. Eggleston's opinions are set forth in her affidavit as follows:

> 2.    I am a board-certified family medicine physician and have been providing reproductive health care for women, including abortion and family planning services, for over a decade.  In addition, I have provided full-spectrum family medicine care, including obstetric and prenatal care and gynecologic services, to numerous patients.  I graduated from the Medical College of Wisconsin with an M.D. in 1996 and from Colorado State University with a B.S. in Biological Science in 1991.  I completed my residency at the University of Wisconsin's Eau Claire Family Medicine Residency Program in 1999.  I have trained residents and medical students in reproductive health care methods, including medication and surgical abortion.
>
> 3.    The opinions provided herein, which are held to a reasonable degree of medical certainty, are based upon my fourteen years of experience as a family medicine physician and reproductive health care provider, and the knowledge I have obtained through my education, training, teaching experience, discussions with colleagues, attendance at conferences, and ongoing review of the relevant professional literature.  A copy of my curriculum vitae, which summarizes my background, experience, and professional activities, is attached as Exhibit A.
>
> 4.    I submit this affidavit in support of Plaintiffs' Motion for Summary Judgment.

**Red River Women's Clinic**

> 5.    Since 2008, I have been the medical director of Red River Women's Clinic in Fargo, North Dakota.
>
> 6.    Pregnancy is commonly measured by the number of days that have passed since the first day of a woman's last menstrual period ("lmp").  The Clinic

provides abortions to women from about five weeks lmp through about sixteen weeks lmp.

7. I provide abortions at the Clinic one day a week, about forty-five to fifty weeks each year.

8. Red River Women's Clinic's protocols include an ultrasound for all abortion patients, which is important for dating the pregnancy and determining where the pregnancy is located within the uterus. A physician needs to confirm an intrauterine pregnancy and gestational age in order to safely provide an abortion.

9. The ultrasound is also used to detect fetal cardiac activity, which is detectible by about 6 weeks lmp on average, and sometimes a few days earlier.

10. The Clinic does not typically perform abortions before five weeks lmp because, due to the pregnancy's extremely small size, it may not be possible to confirm the location of the pregnancy in the uterus, even using vaginal ultrasound. If the location of the pregnancy is not confirmed, it can be dangerous to perform an abortion. Also – most patients do not present to the clinic at this gestational age due to the fact [they] are not aware they are pregnant.

11. North Dakota law defines viability as "the ability . . . to live outside the mother's womb, albeit with artificial aid." N.D. Cent. Code § 14-02.1-02(14). A fetus does not become viable until approximately twenty-four weeks lmp.

12. Many women do not know they are pregnant until after 6 weeks lmp. Typically, only women who have regular menstrual periods, keep close track of them, and take a pregnancy test promptly after missing a period at four weeks lmp will know they are pregnant by 6 weeks.

13. Since the Clinic only performs abortions one day per week, and cannot safely perform abortions before five weeks lmp, the bill will effectively limit women's ability to obtain an abortion to a single day during their pregnancy's fifth week.

14. Most of the women who currently receive abortions from the Clinic at or after 6 weeks lmp would probably be unable to schedule their abortions early enough to avoid the ban, due to a combination of some or all of the following reasons: they will not yet have realized that they are pregnant; they will be unable to gather the necessary funds or obtain transportation in

7

> sufficient time to reach the Clinic; they will be unable to take the necessary time off work with such short notice; they will be waiting through the delays imposed by the laws of the State of North Dakota; or they will need more time than the few days allotted to them to make the important decision of whether or not to have an abortion.
>
> 15.     In my experience, women often consider many factors in deciding whether or not to have an abortion.  These can include, among other things, their ability to care for [existing] children, the impact of parenthood on their educational goals, and the impact of parenthood on their ability to work and pursue a career.  For most women, the risks associated with abortion and the relative risks of abortion compared to carrying a pregnancy to term, are only one factor among many that they consider.

See Docket No. 42-1.

Christie Iverson, M.D. also submitted an affidavit in support of the motion for summary judgment.  See Docket No. 42-2.  Dr. Iverson is a board-certified obstetrician and gynecologist licensed to practice in North Dakota.  Dr. Iverson also opines that viability, or the time when a fetus has a reasonable chance for sustained life outside the womb, albeit with lifesaving medical intervention, does not occur until approximately twenty-four weeks LMP.  She further states "no pregnancy is viable at 6 weeks LMP, nor for several months thereafter."  See Docket No. 42-2, p. 4.  Dr. Iverson's opinions are set forth in her affidavit as follows:

> 1.     I provide the following opinions as an expert in pregnancy, embryonic and fetal development, and the practice of obstetrics in the State of North Dakota. I am a board-certified obstetrician and gynecologist licensed to practice in this state.  I have practiced medicine continuously for over fifteen years.  I received my bachelors of science in zoology from North Dakota State University in Fargo in 1985, and my medical doctorate from the University of North Dakota School of Medicine in Grand Forks in 1991.  I undertook a family practice residency in Fargo from 1991 to 1992, and a residency in obstetrics and gynecology at the University of Minnesota in Minneapolis from 1992 to 1996.  I practiced at the Medical Arts Clinic in Minot from 1996 to 2001, and since then I have worked at Sanford Health (formerly Medcenter One Health Systems) here in Bismarck.  I am a Fellow of the American College of Obstetricians and Gynecologists ("ACOG"), the nation's leading association of medical professionals specializing in

obstetrics and gynecology, and a member of the North Dakota Society of Obstetricians/Gynecologists.  A copy of my curriculum vitae, which summarizes my background and experience, is attached hereto as Exhibit A.

2.      I have reviewed House Bill 1456 ("the bill").  I submit this declaration in support of Plaintiffs' Motion for Summary Judgment.  The opinions I express are held to a reasonable degree of medical certainty, based on my medical education and training, my years of clinical experience in the field of obstetrics, and my review of the medical literature.

**Pregnancy and embryonic and fetal development**

3.      Pregnancy is commonly measured by the number of days that have passed since the first day of a woman's last menstrual period ("lmp").  In a typical pregnancy, an egg is fertilized around fourteen days lmp, and the pregnancy itself begins a week later, when the fertilized egg implants in the uterine lining.  If the pregnancy reaches full term, birth usually occurs around forty weeks lmp.

4.      In a normally developing embryo, cardiogenesis, or heart development, begins at thirty-five days, or five weeks, lmp, when the tissues that will become the heart form a pair of tubes, called heart tubes.  Within two to three days, these tubes fuse together to form the embryonic heart, which begins coordinated motion to circulate blood throughout the embryo.  At this point, the embryo is about one millimeter in diameter.

5.      In early pregnancy, standard medical practice for detecting cardiac activity requires the use of vaginal ultrasound.  Using vaginal ultrasound, cardiac activity is usually detectible by forty-two days, or 6 weeks, lmp.  In some cases, this may occur up to a few days earlier.

6.      Viability, the time when a fetus has a reasonable chance for sustained life outside the womb, albeit with lifesaving medical intervention, does not occur until approximately twenty-four weeks lmp.  No pregnancy is viable at 6 weeks lmp, nor for several months thereafter.

7.      It is my understanding that Red River Women's Clinic performs abortions through approximately 17 weeks lmp.  No fetus is viable at this point in pregnancy.

8.      Missing a period is the hallmark of pregnancy.  A woman with a regular menstrual cycle will have a menstrual period every four weeks.  This means that, if a woman with a regular menstrual cycle becomes pregnant, she will first miss a period at approximately four weeks lmp.

9

9.      However, many women, including most adolescents, have irregular menstrual cycles. In addition to youth, other factors that can lead to irregular menstrual cycles include athletic activity, breastfeeding, stress, the use of birth control, the approach of menopause, and various illnesses. By 6 weeks lmp, women with irregular menstrual cycles may not realize that they have missed a period, and therefore not realize that they are pregnant.

10.     Also, the implantation of an embryo in the uterine lining, at around three weeks lmp, can sometimes cause light vaginal bleeding or spotting. Some women mistake this bleeding for an early menstrual period. These women, too, many not realize they are pregnant by 6 weeks lmp.

11.     Even for women with highly regular periods, 6 weeks lmp will be two weeks after they have their first missed period.

12.     For those women who do know they are pregnant by 6 weeks lmp, HB 1456 would create a narrow window of, at most, two weeks from their first missed period to decide whether they wish to choose to have an abortion and then to obtain one.

See Docket No. 42-2.

The record reveals that many women must travel long distances to the closest abortion provider, where in North Dakota only one clinic provides these services. Tammi Kromenaker indicates in her declaration that the Clinic's patients travel from throughout the state, and from neighboring states, resulting in hundreds of miles of travel for this care. See Docket No. 42-3, p. 3. Due to the small population of North Dakota and surrounding areas, the Clinic typically performs abortions only one day per week. Id. North Dakota law also requires a delay of at least twenty-four hours between the time a patient receives mandated information and when the abortion is performed. See N.D.C.C. § 14-02.1-03. If a patient is a minor, parental consent or judicial authorization is required, sometimes extending the twenty-four hour waiting period. See N.D.C.C. § 14-02.1-03.1 (requiring parental consent or judicial authorization for an abortion of an unmarried minor).

Dr. Eggleston and Dr. Iverson state many women do not know they are pregnant until after six weeks LMP, or after a heartbeat is detected.  See Docket Nos. 42-1, p. 4 and 42-2, p. 4. Typically only women who have regular menstrual periods, keep close track of them, and take a pregnancy test promptly after a missed period at four weeks LMP, will know they are pregnant by six weeks.  See Docket Nos. 42-1, p. 4 and 42-2, p. 4.  Because the Clinic only performs abortions one day per week, and cannot safely perform abortions before five weeks LMP, H.B. 1456 will effectively limit a woman's ability to obtain an abortion to a single day during the pregnancy's fifth week.   See Docket No. 42-1, p. 4.  According to the three most recent years of Induced Termination of Pregnancy Reports made available by the North Dakota Department of Health,[1] 91% of abortions performed at the Clinic occur at and after six weeks LMP.  See Docket No. 42-3.

To refute the issue of viability, the Defendants submitted the affidavit of Jerry M. Obritsch, M.D.  See Docket No. 70.  Dr. Obritsch has opined that viability occurs at the point of conception. In other words, Dr. Obritsch equates viability with conception and states that because newly-created embryos can survive in a test tube for 2-6 days as part of in vitro fertilization ("IVF"), viability occurs at the point of conception.  Id. at ¶¶ 26-30.  The gist of Dr. Obritsch's opinions are set forth in his affidavit:

> 26.    In addition, Dr. Iverson's opinion that viability requires a percent chance the unborn child will survive to adulthood is medically erroneous. Viability in Obstetrics and Human Reproduction has vastly changed over the past

---

[1] N.D. DEP'T OF HEALTH, VITAL RECORDS, *available at* http://ndhealth.gov/vital/pubs.htm (follow Induced Termination of Pregnancy Report; then follow 2010 Report (pdf), 2011 Report (pdf), and 2012 Report (pdf)).  Every abortion performed in North Dakota must be reported using a form provided by the Department of Health.  N.D.C.C. §§14-02.1-02.2 and 14-02.1-07.  The completed form includes the gestational age at which the abortion was performed.  The State compiles this information and reports it on an annual basis.  Because it appears that the Clinic is the only provider reporting abortions in North Dakota, these statistics reflect the percentage of women currently obtaining abortions at and after 6 weeks LMP at the Clinic.  See Docket No. 42-3, p. 3.

decades. Viability was once thought to mean or be defined as only the ability of the unborn child to survive outside the uterus, albeit under the sophisticated care of the Neonatologist in the highly complex medical environment of the Neonatal Intensive Care unit (NICU). In modern and current medical and clinical practice, the embryo is able to survive as a human being independently at conception. This occurred for the first time in 1978 with the successful birth of Louise Brown and was known as the "test tube baby". Dr. Robert G. Edwards, the physiologist who developed the technology to successfully achieve this goal, was awarded the Nobel Prize in Medicine in 2010. Today in vitro fertilization (IVF) is commonly practiced and actually, Reproductive Endocrinology and Infertility (REI) has evolved into a well recognized subspecialty of the field of Obstetrics and Gynecology. It is my medical opinion that the development of Reproductive Technology has caused and allowed an embryonic unborn child to live outside the human uterus (womb) for 2 – 6 days after conception – which is viability as defined by the United States Supreme Court and in the North Dakota statutes because this embryonic unborn child is not just potentially but is in fact living outside the woman's womb, albeit through artificial means. This viable unborn child is then transferred into the human uterus (womb) to continue its gestation. Once a heartbeat is detected in this implanted or any other unborn child within the womb, there exists a medically recognized 98% rate of survival and live birth for the unborn child and this medically recognized rate of survival and live birth drops only slightly to 82% when the woman has a history of recurrent pregnancy loss (being three or more consecutive spontaneous losses of the unborn child). <u>See</u> *Predictive value of the presence of an embryonic heartbeat for live birth: comparison of women with and without recurrent pregnancy loss. Hyer, et al, Sterility and Fertility, vol 82, no 5, November, 2004.* Since in vitro fertilization (IVF) or "test tube baby" – a colloquial term for babies conceived as the result of IVF, first occurred in 1978, 5 years after the decision of <u>Roe vs. Wade</u>, this information was unavailable to the United States Supreme Court for deliberation. However, since 1973, tremendous medical advancements have occurred throughout all areas of Medicine, including the development of completely new areas such as the field of Reproductive Medicine.

27. Therefore based on the foregoing, it is my opinion, to a reasonable degree of medical certainty, an unborn child is viable or viability occurs, as medically defined as well as legally defined, from the time of conception.

> *(d) Viability at a time other than at conception is not a medically valid basis to determine whether state's interests to preserve life of unborn child are sufficiently strong to preclude an abortion.*

28.     It behooves the legal profession to acknowledge the medical developments and advancements, and in turn appropriately act upon the current medical standards to change existing law, which is based on either old, outdated medical science, or previously unknown medical science and fact, or both. Viability now determined to occur at conception (see Paragraphs 19-27 above) provides a solid basis that will stand the test of time because it is not based on the ever shifting and changing neonatal definition, which currently plagues the legal and medical profession. For example, some like Dr. Iverson now conclude viability only can occur at 22-24 weeks last menstrual period (LMP) when only a few years ago, these same parties concluded viability could only occur at 28-30 weeks last menstrual period (LMP). This standard of viability occurring at any time other than conception, being not only medically unsound, plagues the medical profession because of the uncertainty and vagueness when rendering a medical judgment as to whether viability is present for ongoing clinical decision making. Viability at conception is based on medical science and fact and is in alignment with natural law. It is clearly and succinctly defined.

29.     Furthermore, the following sets forth the medically recognized attributes that exist in an unborn child demonstrate the framework of viability, at a time other than at conception, is no longer a medically valid basis:

   (i)      At the moment of conception, an unborn child has a unique set of DNA that never previously existed in the history of the world. Also, the hair and eye color, along with facial features are established at conception.

   (ii)     By 22 days after conception, the unborn child's heart was already beating and for some, with a different blood type than the unborn child's mother.

   (iii)    At 6 weeks after conception, an unborn child has brain function because the unborn child has detectable brain waves. Neurological development of the unborn child begins as early as the fourth week of development. The processes involved in the formation of the neural plate and neural folds and closure of the folds to form the neural tube constitute neurulation. Neurulation is completed by the end of the fourth week. *Moore et al: The Developing Human 9E, Clinically Oriented Embryology, 9th edition, 2013, Chapter 4, Third Week Of Human Development,* page 61. Neurological development not only involves the development of the central nervous system (brain and spinal cord), but the peripheral nervous system as well (sensory and motor (muscle)).

   (iv)     By the 8th week of development, the unborn child experiences pain in any capacity. (Testimony of Maureen L. Condic, PhD, University of

13

Utah, School of Medicine, Department of Neurobiology and Anatomy, before the Subcommittee on the Constitution and Civil Justice, Committee on the Judiciary, U.S. House of Representatives, May 23, 2013 (*judiciary.house.gov/hearings/113th/05232013/Condic%200523 2013.pdf*). Therefore, by the 8th week of development, at the latest, the unborn child has brain function.

(v)   Further, by 8 weeks after conception, every major organ of the unborn child is in place.

30.   Therefore, in my opinion, to a reasonable degree of medical certainty, establishing viability of an unborn child at a time other than at conception is not a medically valid basis to determine whether the state's interests to preserve the life of an unborn child are sufficiently strong to preclude an abortion. Rather, viability being established at conception, and precluding the ending of the life of the unborn intentionally thereafter, is consistent with the state's and the medical profession's obligation to protect the health of the woman and the life of the unborn child and avoids the uncertainty and vagueness that exists with the current standard that will be ever evolving and changing.

<u>See</u> Docket No. 70, ¶¶ 26-30.[2]

### C.   <u>H.B. 1456 VIOLATES A WOMAN'S RIGHT TO DUE PROCESS</u>

The Plaintiffs' challenge to the abortion statute in question focuses on the purported infringement on the constitutional right to choose an abortion first enunciated in <u>Roe v. Wade</u>, 410 U.S. 113 (1973), and refined in <u>Planned Parenthood of Southeastern Pennsylvania v. Casey</u>, 505 U.S. 833 (1992). In *Roe,* the United States Supreme Court held a pregnant woman has a constitutional right, under the Due Process Clause of the Fourteenth Amendment, to choose to terminate her pregnancy before viability. 410 U.S. at 152–66. "[T]he concept of viability . . . is

---

[2] Defense counsel was asked at the hearing whether the Defendants had actually adopted the position that viability occurs at the moment of conception and he said "I can't – I don't think it's been. I don't know if it's been adopted within the Attorney General's Office. I don't know if it's been adopted by the Board of Medical Examiners." Therefore, it appears this new position on abortion is a litigation strategy developed by defense counsel and designed to overturn *Roe v. Wade*, rather than a position adopted by the Defendants.

the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb, so that the independent existence of the second life can in reason and all fairness be the object of state protection that now overrides the rights of the woman." Casey, 505 U.S. at 870 (citing Roe v. Wade, 410 U.S. at 163).

In *Casey,* the Supreme Court upheld *Roe's* essential holding by reaffirming "the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State." 505 U.S. at 846. Thus, a woman has a constitutional right to choose to terminate her pregnancy before the fetus is viable without undue interference by the state. Id. This right is encompassed within a woman's right to personal privacy. The constitutional right to choose recognized in *Roe* and reaffirmed in *Casey* is "the woman's right to make the ultimate decision." Id. at 877.

The Supreme Court in *Casey* also clarified that the right to obtain an abortion is not absolute and that state interests in maternal health and protecting fetal life can, in some circumstances, justify regulations of abortion. Id. at 846. The Supreme Court in *Casey* abandoned *Roe's* trimester framework of analysis for determining the validity of an abortion regulation, and replaced it with an undue burden standard. Under the undue burden standard, an abortion law is unconstitutional on its face if "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." Id. at 845-46; see also Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452, 1456-58 (8th Cir. 1995).

The United States Supreme Court in *Casey* then asked whether a law designed to further the State's interest in fetal life, but which imposed an undue burden on a woman's decision before fetal viability, could be constitutional. Id. at 877. The Supreme Court clearly answered this

15

question "no."  Id.  The plurality opinion in *Casey* contained a summary of the salient points which are useful for the issues presented by the constitutionality of H.B. 1456.

> • An undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus obtains viability.
>
> • To promote the state's profound interest in potential life, throughout pregnancy the state may take measures to ensure that the woman's choice is informed, and measures designed to advance this interest will not be invalidated as long as their purpose is to persuade the woman to choose childbirth over abortion. However, these measures must not be an undue burden on the right to have an abortion.
>
> • As with any medical procedure, the state may enact regulations to further the health or safety of a woman seeking an abortion. Unnecessary health regulations that have the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion impose an undue burden on the constitutionally protected right to choose.
>
> • Regardless of whether exceptions are made for particular circumstances, a state may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability.
>
> • Subsequent to viability, and in promoting its interest in the potentiality of human life, the state may regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.

McCormack v. Hiedman, 900 F. Supp. 2d 1128, 1143-44 (D. Idaho 2013) (citing Casey, 505 U.S. at 878–79).  The plurality in *Casey* explained "[a] finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."  Casey, 505 U.S. at 877.

A woman's constitutional right to terminate a pregnancy before viability has consistently been upheld by the United States Supreme Court for more than forty years since *Roe v. Wade*.  See e.g., City of Akron v. Akron Ctr. for Reprod. Health, Inc., 462 U.S. 416, 420 (1983) (a woman has a constitutional right to terminate her pregnancy) (overruled on other grounds); Casey, 505 U.S.

at 846 (a woman has a right to an abortion before viability without undue interference from the state); Stenberg, 530 U.S. at 921 (a woman has the right to choose an abortion before viability); Gonzales, 550 U.S. 124 (the state may not prevent "any woman from making the ultimate decision to terminate her pregnancy").

The right to terminate a pregnancy is not absolute, and must be balanced with the state's interest in protecting the woman's health and the potential life of the fetus. Roe, 410 U.S. at 162. After the fetus becomes viable, a state's interest in protecting its potential life becomes compelling enough in certain circumstances to outweigh the woman's right to seek an abortion. See Casey, 505 U.S. at 845-46. However, it is clear that before viability, "the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure." Id. The state can impose *regulations* aimed at ensuring a thoughtful and informed choice, but only if such regulations do not unduly burden the right to choose. Id. at 872. The Supreme Court's central holding in *Roe* and *Casey* is that *viability* marks the earliest point at which a state's interest in fetal life may be adequate to justify a ban on non-therapeutic abortions. Thus, it is well-established in United States Supreme Court precedent that before viability a woman has a right to choose to terminate her pregnancy.

Recently, other federal courts have been faced with similar state statutes that would effectively eliminate a substantial portion of abortions in various states. These courts have found such statutes to constitute a substantial obstacle to a woman's right to seek an abortion. See, e.g., Okpalobi v. Foster, 190 F.3d 337, 357 (5th Cir. 1999) (affirming a district court's finding that the regulation's effect of closing clinics which provided approximately 80% of all abortions in the state constituted an undue burden); Planned Parenthood Se., Inc. v. Bentley, 951 F. Supp. 2d 1280

(M.D. Ala. 2013) (granting temporary restraining order where admitting privileges requirement would close three of five clinics in the State of Alabama); <u>Jackson Womens' Health Org. v. Currier</u>, 940 F. Supp. 2d 416 (S.D. Miss. 2013) (granting preliminary injunction after finding an undue burden where state admitting privileges requirement would close the only known abortion provider in Mississippi).

A federal district court in Arkansas recently addressed a very similar constitutional challenge to a state statute seeking to ban abortions where a fetal heartbeat is detected and the fetus has reached twelve weeks gestational age. <u>See</u> <u>Edwards v. Beck</u>, 946 F. Supp. 2d 843 (E.D. Ark. 2013). The United States District Court for the Eastern District of Arkansas found the Plaintiffs met the burden of showing sufficient evidence of each *Dataphase* factor, warranting a preliminary injunction enjoining the act passed by the Arkansas Legislature seeking to prohibit abortions where a fetal heartbeat is detected after twelve weeks LMP. <u>Id.</u> at 846-51. More important, the federal district court in Arkansas found that an abortion law is unconstitutional on its face if, in a large fraction of the cases in which the law is relevant, the law will operate as a substantial obstacle to a woman's choice to undergo an abortion. <u>Id.</u> at 848. The federal case in Arkansas involved a law prohibiting abortions after twelve weeks LMP, which is six weeks later than the North Dakota law (H.B. 1456).

On March 14, 2014, the Arkansas court ultimately determined the portion of the law prohibiting abortions after twelve weeks gestation, and after a heartbeat has been detected, to be unconstitutional. <u>See</u> <u>Edwards v. Beck</u>, No. 4:13-CV00224 SWW, 2014 WL 1245267 (E.D. Ark. Mar. 14, 2014). The Arkansas court found "as a matter of law that the twelve-week abortion ban included in [the Arkansas Legislation] prohibits pre-viability abortions and thus impermissibly

infringes a woman's Fourteenth Amendment right to elect to terminate a pregnancy before viability." Id. at *4.  The federal district court in Arkansas permanently enjoined the enforcement of the portions of the Arkansas law which prohibited abortions "where a fetal heartbeat is detected and the fetus has attained twelve weeks' gestation." Id. at *8.

On May 21, 2013, and prior to the Arkansas ruling, the Ninth Circuit Court of Appeals held that an Arizona law passed prohibiting abortions beginning at 20-weeks gestation was unconstitutional.  See Isaacson v. Horne, 716 F.3d 1213 (9th Cir. 2013).  In the court's words,

> [u]nder controlling Supreme Court precedent, Arizona may not deprive a woman of the choice to terminate her pregnancy at any point prior to viability.  Section 7 effects such a deprivation, by prohibiting abortion from twenty weeks gestational age through fetal viability.  The twenty-week law is therefore unconstitutional under an unbroken stream of Supreme Court authority, beginning with *Roe* and ending with *Gonzales.*  Arizona simply cannot proscribe a woman from choosing to obtain an abortion before the fetus is viable.

Id. at 1231.  The Supreme Court of the United States recently declined to hear the appeal, leaving in place the Ninth Circuit decision and effectively striking down the ban on abortions in Arizona. See Horne v. Isaacson, 134 S. Ct. 905 (2014).  The decision of the Ninth Circuit was consistent with legal precedent established by the United States Supreme Court for more than forty years.

It is clear from United States Supreme Court precedent that *viability*, although not a fixed point, is the critical point.  The Supreme Court in *Casey* noted that although the line of viability may come earlier with advances in neonatal care, the attainment of viability continues to serve as the critical factor.  505 U.S. at 860.  The Supreme Court in *Casey* could not have been more clear in stating:

> We have seen how time has overtaken some of *Roe*'s factual assumptions: advances in maternal health care allow for abortions safe to the mother later in pregnancy than was true in 1973, . . . and advances in neonatal care have advanced viability to a point somewhat earlier. . . . But these facts go only to the scheme of time limits

19

on the realization of competing interests, and the divergences from the factual premises of 1973 have no bearing on the validity of *Roe*'s central holding, that viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions. The soundness or unsoundness of that constitutional judgment in no sense turns on whether viability occurs at approximately 28 weeks, as was usual at the time of *Roe*, at 23 to 24 weeks, as it sometimes does today, or at some moment even slightly earlier in pregnancy, as it may if fetal respiratory capacity can somehow be enhanced in the future. Whenever it may occur, the attainment of viability may continue to serve as the critical fact, just as it has done since *Roe* was decided; which is to say that no change in *Roe*'s factual underpinning has left its central holding obsolete, and none supports an argument for overruling it.

Id.

Although viability may be a flexible point, it is clearly one that is medically determinable. The United States Supreme Court has repeatedly held that "'the determination of whether a particular fetus is viable is, and must be, a matter for the judgment of the responsible attending physician.'" Colautti v. Franklin, 439 U.S. 379, 396 (1979) (citing Planned Parenthood of Cent. Mo. v. Danforth, 428 U.S. 52, 64-65 (1976)). The Supreme Court further said that is precisely why a state may not fix viability at a specific point in the pregnancy. Id. at 388-89.

This Court fully recognizes the attainment of viability may continue to come earlier in a pregnancy with significant advances in medicine. The practical effect of H.B. 1456 is to prohibit any abortion after a heartbeat is detected, which can occur as early as six weeks LMP. Coupled with the standard set forth in current North Dakota law that an abortion is allowed until viability, the new law suggests a fetus is viable at six weeks which is the point a heartbeat is generally detected.

For purposes of this lawsuit, the Defendants have now taken it one step further and assert that viability occurs at the moment of conception. Counsel for the Defendants acknowledged that he was unaware of any other state in the country, or any other case in the country, where an expert

20

witness has opined that viability occurs at the moment of conception.  Although the Defendants have strained to create a material issue of fact through the affidavit of Dr. Obritsch, the position that viability occurs at the moment of conception is one this Court is obligated to reject under binding precedent of the United States Supreme Court.

The Plaintiffs submitted affidavits of two experienced medical professionals whom have opined that viability does not occur until twenty-four weeks LMP.  That time frame appears to be consistent with modern day medicine.  It is also consistent with the litany of United States Supreme Court case law this Court is bound to uphold.  The evidence presented under the applicable substantive law is so one-sided that summary judgment is appropriate and warranted based on the lack of any genuine issue of material fact.

The Court finds that the affidavit of Dr. Obritsch does not create a genuine issue of material fact primarily because Dr. Obritsch uses a different definition of viability than the one used by either the United States Supreme Court or the medical community generally.  It is clear from *Roe* and *Casey*, and the medical authority cited therein, that viability "is the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb," albeit with artificial aid.  Casey, 505 U.S. at 870; Roe, 410 U.S. at 163.  That is, viability is the time that life can be sustained on a continuous basis outside the womb without having to be returned to the womb for proper development.

The definition of viability announced by the Supreme Court in *Roe* and *Casey* is contrary to Dr. Obritsch's definition.  The affidavit of Dr. Obritsch asserts that viability occurs at conception because of the ability of the embryo to be sustained by artificial means outside the womb for a short period of time before being returned to the uterus "to continue its gestation."  See Docket

21

No. 70, ¶ 26.  The State does not contend that an embryo can be sustained on a continuous basis, and properly nourished from the time of conception, without the need for further development in the uterus.  Nor has the State cited to any medical literature to support this theory of viability. There may indeed be medical developments that will one day significantly affect the precise point of viability.  But the Supreme Court has announced the rule of law which this Court has no authority to renounce.  The affidavit submitted by the State to support the position that viability occurs at the moment of conception is contrary to the rule of law established in *Roe* and *Casey*. The Defendants have failed to provide reliable evidence that a fetus, at the time a heartbeat is first detected around six weeks, could live outside of the mother's womb and thus be *viable*.

The Defendants have admittedly undertaken an effort to overturn *Roe v. Wade* and United States Supreme Court precedent that has existed for decades.  The State has recently taken the position in this lawsuit that a fetus is *viable* at the point of conception.  Neither this Court nor any other federal district court in the country has the discretion to take that giant leap based on a definition of viability that is contrary to that announced by the Supreme Court.  To take the position that viability occurs at the moment of conception results in a complete ban of all abortions which is in clear defiance of United States Supreme Court precedent.

Suffice it to say the Defendants' arguments rest on the premise that every federal district court and appellate court in this country which has upheld the law as announced by the United States Supreme Court for the past forty years has misread Supreme Court precedent.  The bright-line viability rule the United States Supreme Court established in *Roe* and affirmed in *Casey* cannot be overturned by this Court based on a single affidavit of a physician who has opined that viability occurs at the point of conception.

H.B. 1456 clearly prohibits pre-viability abortions in a very significant percentage of cases in North Dakota, thereby imposing an undue burden on women seeking to obtain an abortion. H.B. 1456 equates fetal viability with a 6-week gestational age and a fetal heartbeat, and it bans abortions according to that definition. On December 19, 2013, the State submitted an affidavit and has now essentially taken the position that _all_ abortions after the point of conception are prohibited. Even counsel for the State of North Dakota acknowledged this position is unprecedented in this country. This position is clearly contrary to the law of the land as announced by the United States Supreme Court, and which this Court is obligated to apply. It is well-established that controlling United States Supreme Court precedent provides that viability is "the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb, so that the independent existence of the second life can in reason and all fairness be the object of state protection . . . ." Casey, 505 U.S. at 870 (citing Roe, 410 U.S. at 163).

It is clear and undisputed that until _Roe v. Wade_ and _Planned Parenthood of Southeastern Pennsylvania v. Casey_ are overturned by the United States Supreme Court, all lower courts are bound to follow that precedent under the rule of _stare decisis_. See Casey, 505 U.S. at 870 (stating that the doctrine of _stare decisis_ requires reaffirmance of _Roe v. Wade_'s essential holding recognizing a woman's right to choose an abortion before fetal viability). In considering the fundamental constitutional question resolved by _Roe v. Wade_ and _Casey_, principles of institutional integrity, and the rule of _stare decisis_, this Court is led to conclude that H.B. 1456 is unconstitutional.

III.     **CONCLUSION**

After a careful review of the entire record, there is no question that North Dakota House Bill 1456 is in direct contradiction of United States Supreme Court case law addressing restraints on abortion.  H.B. 1456 is an invalid and unconstitutional law based on the United States Supreme Court precedent in *Roe v. Wade* from 1973, *Planned Parenthood of Southeastern Pennsylvania v. Casey* from 1992, and the litany of cases that have followed.  As a practical matter, H.B. 1456 would ban nearly all abortions performed at the only clinic in North Dakota which provides such services.  If this Court adopts the Defendants' newly-stated position that viability occurs at the point of conception, H.B. 1456 would ban all abortions performed in North Dakota.  The North Dakota strict ban on abortions at the time when a "heartbeat" has been detected – essentially banning all abortions as early as six weeks of pregnancy – cannot withstand a constitutional challenge.

A woman's constitutional right to terminate a pregnancy before viability has been recognized by the United States Supreme Court for more than forty years.  The United States Supreme Court has clearly determined the dispositive issue presented in this lawsuit.  This Court is not free to impose its own view of the law.

The State of North Dakota has presented no reliable medical evidence to justify the passage of this troubling law.  No genuine issue of material fact is created by a single affidavit that contravenes existing Supreme Court case law, and was offered for the purpose of attempting to overturn long-standing United States Supreme Court precedent.   As the Court noted back in July of 2013, the State has extended an invitation to an expensive court battle over a law restricting all abortions that is a blatant violation of the constitutional guarantees afforded to all women.

The United States Supreme Court has spoken and has unequivocally said no state may deprive a woman of the choice to terminate her pregnancy at a point prior to viability.  The Supreme Court recently declined to hear an appeal from the Ninth Circuit Court of Appeals which struck down an Arizona law prohibiting abortions beginning at 20-weeks gestation.  Further, the Supreme Court has never held that viability occurs at the point of conception, which is the new position advocated by the State of North Dakota in its responsive pleadings, in an effort to overturn *Roe v. Wade*.  The controversy over a woman's right to choose to have an abortion will never end.  The issue is undoubtedly one of the most divisive of social issues.  The United States Supreme Court will eventually weigh in on this emotionally-fraught issue but, until that occurs, this Court is obligated to uphold existing Supreme Court precedent.

Accordingly, the Court **GRANTS** the Plaintiffs' motion for summary judgment (Docket No. 40) and permanently enjoins the implementation of House Bill 1456.  With no further issues to be decided, the Court **FINDS AS MOOT** the Defendants' motion for discovery (Docket No. 66).

**IT IS SO ORDERED.**

Dated this 16th day of April, 2014.

*/s/  Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court